**MAYER LAW GROUP, LLC**
Carl J. Mayer, Esq.
Zachary J. Liszka, Esq.
1180 Avenue of the Americas, Suite 800
New York, New York 10036
(212)382-4686
(212)382-4687

**LAW OFFICE OF TED M. ROSENBERG**
Ted M. Rosenberg, Esq. (*pro hac vice* application pending)
Robert Rosenberg, Esq. (*pro hac vice* application pending)
321 New Albany Rd.
Moorestown, NJ 08057
(856)608-9999
*Attorneys for Plaintiffs and the Putative Class*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS ESTLER, BLAKE RUEHRWEIN, and STEVEN PARK, on behalf of themselves and all other similarly situated, | CIVIL NO:1:16-cv-00932-LGS<br>Judge Lorna G. Schofield |
| Plaintiffs, | ORAL ARGUMENT REQUESTED |
| vs. | |
| DUNKIN' BRANDS, INC., DUNKIN' DONUTS STORE #350125, DUNKIN' DONUTS STORE #350126, DONUTS STORE #350127, DUNKIN' DONUTS STORE #345768, and JOHN DOES 1-500, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW AND FACT
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## TABLE OF CONTENTS

**EXECUTIVE SUMMARY** ....................................................................................................1

**FACTS** ................................................................................................................................2

**ARGUMENT** ......................................................................................................................7

  **I.**    **THE COURT HAS SUBJECT MATTER JURISDICTION**................................7

     A.    The Claims Arise From Defendants' Omissions That Occurred *After* the
Collection of Sales Tax ...................................................................................9

     B.    Defendants Have Failed to Fulfill a Condition Precedent to Requesting a Refund
Under N.Y. Tax Law § 1139 .........................................................................11

     C.    Nothing Prevents Defendants From Returning the Illegal Surcharges to Plaintiffs
First, and Applying for a Refund Themselves ..............................................13

     D.    The Deceptive Practices Act States it Shall Apply "Whether or Not Subject to
Any Other Law of This State ........................................................................15

  **II.**    **THE APPLICABLE LEGAL STANDARD** .......................................................16

     A.    Subject Matter Jurisdiction ...........................................................................16

     B.    Failure to State A Claim................................................................................18

  **III.**    **THE PLAINTIFFS HAVE STATED PLAUSIBLE CLAIMS** ........................19

     A.    Plaintiffs Have Stated Plausible GBL § 349 Claims ............................19

     B.    Plaintiffs Have Stated Plausible Fraud Claims....................................22

     C.    Plaintiffs Have Stated Plausible Negligence Claims ...........................27

     D.    Plaintiffs Have Stated Plausible Breach of Contract Claims ...............30

     E.    Plaintiffs Have Stated Plausible Unjust Enrichment Claims.................31

## TABLE OF AUTHORITIES

CASES

*Kaufman v. Cohen*
   307 A.D.2d 113, 760 N.Y.S.2d 157 (1st Dep't 2003) ..................................................22

*Acito v. IMCERA Group, Inc.*
   47 F.3d 47 (2d Cir.1995) ...........................................................................................23

*Akins v. Glens Falls City Sch. Dist.*
   53 N.Y.2d 325 (1981).................................................................................................27

*Albert Apartment Corp. v. Corbo Co.*
   182 A.D.2d 500N.Y.S.2d 409 (1st Dep't 1992) ............................................................22

*Alfaro v. Wal–Mart Stores, Inc.*
   210 F.3d 111 (2d Cir.2000) .......................................................................................27

*Ashcroft v. Iqbal*
   556 U.S. 662 (2009) ..................................................................................................18

*Associated Industries v. Ickes*
   134 F.2d 694 (2d Cir. 1943) .........................................................................................7

*AT & T Mobility Wireless Data Services Sales Tax Litig.*
   *789 F. Supp. 2d 935 (N.D. Ill. 2011* .....................................................................1, 14

*Aurecchione v. Schoolman Transp. Sys. Inc.*
   426 F.3d 635 (2d Cir.2005) .......................................................................................16

*Bell Atlantic Corp. v. Twombly*
   550 U.S. 544 (2007) ..................................................................................................18

*Bernstein v. Polo Fashions, Inc.*
   55 A.D.2d 530 (1st Dep't 1976) ................................................................................26

*Briarpatch Ltd. P'ship v. Phoenix Pictures, Inc.*
   373 F.3d 296 (2d Cir. 2004) ......................................................................................31

*Childers v. New York and Presbyterian Hosp.*
   36 F. Supp. 3d 292 (S.D.N.Y. 2014) ......................................................................1, 16

*Clark v. Daby*
   300 A.D.2d 732 (3d Dep't 2002) ...............................................................................31

*Cohen v. Hertz Corp.*
13 CIV. 1205 LTS AJP, 2013 WL 9450421 (S.D.N.Y. Nov. 26, 2013) ........................ 11

*Crigger v. Fahnestock & Co.*
443 F.3d 230 (2d Cir.2006) ........................................................................ 22

*Curran, Cooney, Penney v. Young & Koomans*
183 A.D.2d 742 (N.Y. App. Div. 1992) ....................................................... 23

*Dalton v. Educ. Testing Serv.*
87 N.Y.2d 384 (1995) ............................................................................... 30

*EED Holdings v. Palmer Johnson Acq. Corp.*
387 F. Supp. 2d 265 (S.D.N.Y. 2004) ........................................................ 26

*Exchange National Bank of Chicago v. Touche Ross & Co.*
544 F.2d 1126 (2d Cir. 1976) .................................................................... 17

*F.C.C. v. Natl. Broad. Co.*
319 U.S. 239 (1943) ................................................................................. 7

*Famous Horse Inc. v. 5th Ave. Photo Inc.*
624 F.3d 106 (2d Cir. 2010) ...................................................................... 18

*Farino v Jiffy Lube Intl.*
298 AD2d 553 (2002) ............................................................................... 16

*First Bank of Americas v. Motor Car Funding*
257 A.D.2d 287 (1st Dep't 1999) ............................................................... 26

*Freedman v. Pearlman*
271 A.D.2d 301 (1st Dep't 2000) ............................................................... 26

*Genesco Entertainment, a Div. of Lymutt Industries, Inc. v. Koch*
593 F. Supp. 743 (S.D. N.Y. 1984) ............................................................ 19

*G–I Holdings Inc. v. Baron & Budd*
179 F.Supp.2d 233, 269 (S.D.N.Y.2001) .................................................... 26

*Gilbert v. Home Depot, Inc.*
No. 13-cv-853S, 2014 WL 4923107 (W.D.N.Y. Sept. 30, 2014) ................... 11

*Gordon v. National Youth Work Alliance*
675 F.2d 356 (D.C.Cir.1982) .................................................................... 17

*Hart v. Moore*

155 Misc.2d 203 (N.Y. Misc. 1992) ................................................................15

*Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*
227 F.3d 8 (2d Cir. 2000) .............................................................................28

*In re Hurley*
1998 N.Y.T.C. T-351 (N.Y.S. Div. of Tax App. 1998) ..................................12

*In the Matter of the Petition of New Cingular Wireless PCS LLC*
Determination DTA No. 825318 (N.Y. Div. Tax App. July 2014).............8, 14

*Investment Properties International, Ltd. v. IOS, Ltd.*
459 F.2d 705 (2d Cir.1972) ..........................................................................17

*Kamen v. American Tel. & Tel. Co.*
791 F.2d 1006 (2d Cir.1986) .........................................................................17

*Lerner v. Fleet Bank, N.A.*
459 F.3d 273 (2d Cir.2006) ...........................................................................22

*Licette Music Corp. v. A.A. Records, Inc.*
196 A.D.2d 467 (1st Dep't 1993) ..................................................................26

*Llanos v. Shell Oil Co.*
866 N.Y.S.2d 309 (N.Y. App. Div. 2d Dept. 2008) ......................................16

*Mandarin Trading Ltd. v. Wildenstein*
16 N.Y.3d 173 (2011)................................................................................18, 22

*Matter of Paver & Wildfoerster Catholic High School Assn.*
38 N.Y.2d 669 (N.Y. Ct. App. 1976) ............................................................28

*Miller v. Indiana Hospital*
562 F.Supp. 1259, 1267 n. 11 (W.D.Pa.1983) ..............................................18

*North Shore Bottling Co. v. Schmidt & Sons*
22 N.Y.2d 171 (N.Y. 1968)...........................................................................28

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*
647 N.E.2d 741 (N.Y. 1995) ..........................................................................19

*Peay v. Morton*
571 F.Supp. 108 (M.D.Tenn.1983) ...............................................................18

*Riordan v Nationwide Mut. Fire Ins. Co.*
756 F. Supp. 732 (S.D.N.Y. 1990) ................................................................15

*Scheuer v. Rhodes*
   416 U.S. 232 (1974). ................................................................................16

*Schumaker v. Mather*
   133 N.Y. 590 (Ct. of App. 1892) ..............................................................23

*N. Shipping Funds I. L.L.C. v. Icon Capital Corp.*, No. 12 Civ. 2584 (JCF), 2014 WL
   700198 (S.D.N.Y. Feb. 24, 2014) ..............................................................32

*Shields v. Citytrust Bancorp, Inc.*
   25 F.3d 1124 (2d Cir.1994) ........................................................................23

*Sommer v. Federal Signal Corp.*
   79 N.Y.2d 540 (1992),.................................................................................28

*Timberlane Lumber Co. v. Bank of America*
   574 F.Supp. 1453 (N.D.Cal.1983)..............................................................18

*Travellers Int'l, A.G. v. Trans World Airlines, Inc.*
   41 F.3d 1570 (2d Cir.1994) ........................................................................30

*United States v. Allen*
   No. 1:91CV0244, 1992 WL 437652 (N.D.Ohio 1992)................................32

*UST Private Equity Invs. Fund v. Salomon Smith Barney,*
   288 A.D.2d 87 (App. Div. 2001)................................................................23

*Violette v. Armonk Associates, L.P.*
   872 F. Supp. 1279 (S.D.N.Y. 1995) ..........................................................33

*Walts v First Union Mtge. Corp.*
   259 A.D. 2d 322 (N.Y. App. Div. 1999) ....................................................16

*Williamson v. Tucker*
   645 F.2d 404 (5th Cir.) ..............................................................................18

**STATUTES**

N.Y. General Business Law § 349 ..............................................................8, 15

N.Y. Tax Law § 1105(d)(i)(3) ...................................................................7, 10

N.Y. Tax Law § 1139(a) ................................................................................8

**OTHER AUTHORITIES**

"Who Pays? A Distributional Analysis of the Tax Systems in All 50 States", 5th Edition, p. 94. (last accessed May 10, 2016). Http://www.itep.org/pdf/whopaysreport.pdf ..............3

Consumerist, https://consumerist.com/2008/05/01/dunkin-donuts-suing-its-own-small-franchisees-out-of-existence/..............................................................................................4

IRWIN BARKAN, DUNK'D: A TRUE STORY OF HOW BIG MONEY IS CORRUPTING THE FRANCHISING INDUSTRY (2011)............................................................................5

Joseph Lipari, *Sales Tax Refund Cases Show No Sympathy For Sellers*, The New York Law Journal (September 12, 2014) ......................................................................................14

Note, *The Elastic Concept of Tort and Contract As Applied By the Courts of New York,* 14 Brooklyn L.Rev. 196 (1948) ........................................................................................28

NY Daily News, Cindy Gluck - Franchisee - http://www.nydailynews.com/new-york/brooklyn/dunkin-donuts-business-practices-lots-holes-article-1.278131 .................4

Prosser, Selected Topics on the Law of Torts, ch. VII, *The Borderland of Tort and Contract* (1953) .........................................................................................................................28

## EXHIBITS

Exhibit 1, *July 3, 2013 Reply to May 1, 2013 Letter From Dunkin' Donuts to New Jersey Department of Taxation*......................................................................................................5

Exhibit 2, *In the Matter of the Petition of Forest View Adult Day Care,* 2006 WL 2398703, (N.Y. Tax. App. Trib.).....................................................................................................5

Exhibit 3, *Franchise Disclosure Document, Dunkin' Donuts Franchising LLC, p. 76-78*....4

## EXECUTIVE SUMMARY

This court ruled in *Childers* that when misrepresentations are made after the collection of "taxes", a law court – not a tax court – should retain jurisdiction to evaluate the fraud perpetrated upon the class.  *Childers v. New York and Presbyterian Hosp.,* 36 F. Supp. 3d 292, 301 (S.D.N.Y. 2014). Similar to *Childers,* this is a case where Defendants collected money improperly, and thereafter breached their duty to inform Plaintiffs and the putative Class about their right to request a refund, where the relevant material information needed to know to make such a request rested solely with Defendants.

Other federal courts have retained jurisdiction over cases involving efforts to surcharge customers for "taxes" that are unlawfully collected.  In *AT & T Mobility Wireless Data Services Sales Tax Litig.,* a federal district court in Illinois retained subject matter jurisdiction and forged a nationwide settlement in a multi-district case involving a similar scheme whereby a telephone company unlawfully collected surcharges in the guise of state sales tax on a nationwide basis. *See AT & T Mobility Wireless Data Services Sales Tax Litig., 789 F. Supp. 2d 935, 939 (N.D. Ill. 2011).*

This case could be resolved by a Magistrate Judge in short order by using the template established in *AT & T Mobility Wireless Data Services Sales Tax Litig*.  That procedure would allow Defendants to first make consumers whole, and thereafter apply for a refund from the State of New York.   In fact, that procedure is specifically set forth in N.Y. Tax Law § 1139, and we submit should be followed.

This procedure would amount to little or no cost to Defendants.  Nor would this procedure require concurrent jurisdiction of the courts or any cumbersome mechanisms.

1

Defendants could work with a Magistrate Judge to create a fund via Fed. R. Civ. P. Rule 23 to make the customers whole, and then Defendants can simply apply for a refund from the State. There is no dispute that defendants improperly added an additional 8.875 % to the class Plaintiffs' bills when they purchased pre-packaged coffee at Defendants' stores.   And only this Court can achieve an equitable result that makes Plaintiffs' whole, while insuring that neither Defendants nor the State reap an unlawful windfall.

This simple, efficient mechanism--at little or no cost to Defendants-- is the only way to protect the integrity of New York's tax system and achieve the equitable goal of making Defendants' customers whole.   Plaintiffs' can think of no reason for Defendants not to avail themselves of this mechanism, instead of forcing Plaintiffs and they putative Class to apply for a refund that they don't know they are due and that can't be ordered on a class basis.

## FACTS

Lead class Plaintiff Thomas Estler lives in a Single Room Occupancy (SRO) apartment in the West Side YMCA in Manhattan.  After overcoming a life of homelessness on the streets of New York and a near terminal medical condition, Mr. Estler recovered and now earns a living as a fitness instructor, author and even does charitable work protecting victims of human trafficking.

Mr. Estler is precisely the type of individual the New York State Legislature sought to protect when it enacted N.Y. Tax Law §§ 1101, *et seq*. in 1965, and specifically exempted from the tax basic foodstuffs like pre-packaged coffee.  This system of exempting basic foodstuffs from taxation reflects the Legislature's avowed policy decision that a tax on sales is the most

regressive of all taxes.[1]  Just like millions of others New Yorkers, Mr. Estler spends a greater proportion of his income on basic necessities than do more affluent New Yorkers. For New Yorkers in the bottom 20%, making $18,000 or less, sales taxes represent 7.6% of their total income. For New Yorkers in the top 1%, making $604,000 or more, sales tax represents 0.9% of their total income.[2]

The uncontroverted facts of this case are that Mr. Estler and his fellow class Plaintiffs purchased pre-packaged coffee at Dunkin' Donuts stores located in and around Penn Station, New York.   In each of those stores, Defendants unlawfully levied a surcharge of 8.875% of the bill. Compl. (ECF 3) ¶ 3.   Defendants do not deny this.  Nor do Defendants even aver that the illegal surcharge was turned over to the State of New York, nor do they specifically deny that they kept the proceeds.

The State of New York ("State") entrusts businesses with the duty to collect and remit sales tax, and consequently, it trusts businesses not to abuse this duty. However, when a business profits by assessing illegal surcharges in the guise of sales tax, and conceals the information necessary for its customers to know to request a refund from the State, it abuses its duty. When a business abuses its duty in a fraudulent and deceptive way, it can rob both the State and its customers of their money, without either knowing.

*The Relationship Between Defendants*

Defendant Dunkin' Brands, Inc. ("Dunkin' Brands") is the corporate parent of the individual Dunkin' Donut franchisees in New York (herein "Defendant Franchisees" and collectively "Defendants"). *See* Compl. (ECF 3) ¶¶ 29-30.

---

[1] *See generally* "Who Pays? A Distributional Analysis of the Tax Systems in All 50 States", 5th Edition, p. 94. (last accessed May 10, 2016). Http://www.itep.org/pdf/whopaysreport.pdf
[2] *Id.*

Defendant Dunkin' Brands core defense is that they don't set prices or collect taxes for the Franchisees.    Dunkin' Brands argument is reminiscent of the famous line of Sergeant Schultz in the old "Hogan's Heroes" television series:  "I hear nothing, I see nothing, I know nothing!"

Defendant Dunkin' Brands defense is just not believable.   The complaint specifically pleads that Defendant Dunkin' Brands has the ability to set the taxes Defendant Franchisees charge their customers. *See* Compl. (ECF 3) ¶¶ 15, 30-31. The franchise agreements between Defendant Dunkin' Brands and Defendant Franchisees specifically mandates that Defendant Franchisees use *Radiant* cash registers, pre-programmed with software customized by Defendant Dunkin' Brands to transact all sales. *See* Compl. (ECF 3) ¶¶ 30,31; *see* Exhibit 3, *Franchise Disclosure Document, Dunkin' Donuts Franchising LLC, p. 76-78.* This software allows Defendant Dunkin' Brands real-time access to every single cash register transaction in every single Dunkin' Donuts store in the country, including all stores in New York State. *Id.*

Indeed, Defendant Dunkin' Donuts has engaged in more litigation with its franchisees than any other national franchise, primarily because of the exacting level of control Defendant Dunkin' Brands exercises over its franchisees.[3] Between 2006 and 2008, for example, Dunkin' Brands sued their franchisees 154 times.[4]  During the same period, McDonalds filed five lawsuits against its franchisees; and Subway--despite having four times as many stores as Dunkin'--filed only 12 cases against its franchisees. Defendant Dunkin' Brands is trying to have

---

[3] Consumerist, https://consumerist.com/2008/05/01/dunkin-donuts-suing-its-own-small-franchisees-out-of-existence/
[4] NY Daily News, Cindy Gluck - Franchisee - http://www.nydailynews.com/new-york/brooklyn/dunkin-donuts-business-practices-lots-holes-article-1.278131

it both ways by retaining almost complete control of what its franchisees do, while now disingenuously professing that the franchisees are independent, so as to escape liability.[5]

Defendant Dunkin' Brands has the motivation to cause Defendant Franchisees' stores to assess an illegal surcharge in the guise of a sales tax on pre-packaged coffee because it stands to reap additional franchise royalties as a result, and likewise, Defendant Franchisees have the motivation to go along with it so they too can reap additional profits. *See* Compl. (ECF 3) ¶ 30.

While Defendant Dunkin' Brands has had the opportunity to explain to this Court where the illegal surcharges went, it has failed to do so in its Memorandum of Law. In similar fashion, Defendant Franchisees has also failed to explain where the illegal surcharges went in their separate Memorandum of Law.

*Defendants Know Their Pre-packaged Coffee is Non-taxable*

Defendants know that their pre-packaged coffee is non-taxable in New York. *See* Compl. (ECF 3) ¶¶ 4-7, 37-39, 50-53.  Defendants know or should know their pre-packaged coffee is non-taxable because Defendant Dunkin' Brands has requested tax opinions from the New Jersey Department of Taxation regarding the taxability of its pre-packaged coffee (involving a tax scheme essentially similar to the New York regime exempting coffee.) *See* Exhibit 1, *July 3, 2013 Reply to May 1, 2013 Letter From Dunkin' Donuts to New Jersey Department of Taxation;*

Defendant Franchisees and Dunkin' Brands know or should know of tax opinions from the New York Department of Taxation that hold pre-packaged coffee is non-taxable. *See* Exhibit 2, *In the Matter of the Petition of Forest View Adult Day Care,* 2006 WL 2398703, at *9 (N.Y. Tax. App. Trib.). If this case proceeds, Plaintiffs will demonstrate that not only does Defendant

---

[5] See IRWIN BARKAN, DUNK'D: A TRUE STORY OF HOW BIG MONEY IS CORRUPTING THE FRANCHISING INDUSTRY (2011).

Dunkin' Brands solicit tax opinions, but it then instructs franchisees what "tax" or surcharge to levy on customers.

*Defendants Conceal Information From Their Customers that Would Put Them on Notice of Their Right to Request a Refund*

Defendants know that a customer cannot ascertain whether pre-packaged coffee is taxable or not without information solely within Defendants' possession. *See* Compl. (ECF 3) ¶¶ 38. To the extent that Defendants argue this court lacks subject matter jurisdiction, Defendant Dunkin' Brands knows this because, in the past, it has requested tax opinions on the taxability of pre-packaged coffee, and along with Defendant Franchisee, knows or should know of New York Department of Taxation opinions that hold pre-packaged coffee is non-taxable. S*ee* Exhibit 1 and Exhibit 2, *supra*.

As a result, Defendants know that determining whether their pre-packaged coffee is taxable or not turn on facts solely within their possession. Consequently, Defendants know that unless they put their customers on notice that they should request a refund, their customers will forever be deprived of their right to do so.

Armed with this knowledge, Defendants concealed and continue to conceal the information necessary for their customers to know to request a refund. *See* Compl. (ECF 3) ¶¶ 1-7. As a result, Defendants reap a substantial windfall from their concealment, at the expense of Plaintiffs and the putative Class.

This case is brought by a law firm with decades of experience in consumer law and government, and is done so in the best tradition of the "private attorney general" concept of allowing lawyers to vindicate the public in civil actions. That concept was first given birth by Second Circuit Judge Jerome Frank in his 1943 opinion in *Associated Industries v. Ickes,* 134

F.2d 694 (2d Cir. 1943), and Justice Douglas' dissent in *F.C.C. v. Natl. Broad. Co.,* 319 U.S.
239, 265 n. 1 (1943).

## ARGUMENT

## I.      THE COURT HAS SUBJECT MATTER JURISDICTION

This Court has subject matter jurisdiction for four reasons, as more fully explained below
in Section I. A-D.  Defendants' motions to dismiss on the ground that this Court lacks subject
matter jurisdiction should be denied.

First, this Court held in *Childers* that where a claim "stems not from [defendant's]
collection of...taxes but from later, independent actions and omissions, such as...not filing refund
claims on behalf of Plaintiffs and not informing Plaintiffs that they should file refund claims for
themselves" the court has subject matter jurisdiction. *Childers v. New York and Presbyterian
Hosp.,* 36 F. Supp. 3d 292, 303 (S.D.N.Y. 2014).

Like in *Childers,* this class action is properly before this Court because Defendants
breached a duty to disclose relevant material information solely in their possession that would
put the Plaintiffs and the putative Class on notice that they were entitled to a refund. Defendants
concealed information regarding whether, under N.Y. Tax Law § 1105(d)(i)(3), Defendants' pre-
packaged coffee is sold in the same quantities, condition, packaging and form as in other grocery
stores from Plaintiffs and the putative Class. *See* Compl. (ECF 3) ¶¶ 1-7. Defendants had a duty
to disclose such information, because they know that without it, Defendants' customers would
not know to request a refund.  *See* Compl. (ECF 3) ¶¶ 38.

For the hundreds of thousands of Dunkin' customers whose right to request a tax refund
has expired because Defendants concealed this information, the injury caused is irreparable.

But, for the hundreds of thousands of Dunkin' customers whose claims have yet to expire, the injury can still be redressed by this Court.

Second, asking each customer to request a tax refund when they do not know to do so because of Defendants' omissions not only undermines the purpose of the tax exemptions, it results in a windfall for Defendants if they have in fact failed to remit the monies to the State. Whether Defendants have remitted the illegal surcharge to the State is dubious because neither Defendant is willing to say they have remitted the illegal surcharge in their Memorandums of Law.

Third, nothing in the plain language of N.Y. Tax Law § 1139(a) prevents this Court from retaining jurisdiction to decide the claims before this Court. If, in fact, Defendants have remitted the illegal surcharges to the State, N.Y. Tax Law § 1139(a) provides a simple mechanism for Defendants to make a refund request themselves after this case is resolved.

In *AT & T Mobility,* the court approved use of such a mechanism pursuant to N.Y. Tax Law § 1139(a). *AT & T Mobility Wireless Data Services Sales Tax Litig., 789 F. Supp. 2d 935, 939 (N.D. Ill. 2011).*The multi-district court in *AT & T Mobility* retained jurisdiction over claims that AT & T had illegally assessed a sales tax from its customers. The court in *AT & T Mobility* approved a settlement requiring AT& T to first repay its customers, then request a tax refund themselves, pursuant to N.Y. Tax Law §1139(a). Thus, the mechanism within N.Y. Tax Law § 1139(a) not only provides the most efficient resolution of class claims, it makes Defendants whole again because they can request a refund from the State, after repaying its customers.

Fourth, the mechanism within N.Y. Tax Law § 1139(a) would allow this Court to avoid undermining the legislative intent behind the New York Deceptive Practices Act (herein "GBL § 349"), which provides that the statute "shall apply to all deceptive acts or practices declared to

be unlawful, *whether or not subject to any other law of this state*". GBL § 349-g (emphasis added).

Each of these reasons are more fully explained below.

## A.     The Claims Arise From Defendants' Omissions That Occurred *After* the Collection of Sales Tax

This Court has subject matter jurisdiction because Defendants' liability is predicated on omissions that occurred *after* the collection of the illegal surcharge, and are *independent thereof*.

> A corollary is that these actions do not arise out of the Hospital's collection of taxes, and therefore do not implicate the rationale for excusing the employer as tax collector from liability for tax refunds. The Hospital's alleged liability here stems not from its collection of FICA taxes but from later, independent actions and omissions, such as...*not filing refund claims on behalf of Plaintiffs and not informing Plaintiffs that they should file refund claims for themselves.*
>
> *Childers v. New York and Presbyterian Hosp.*, 36 F. Supp. 3d 292, 303 (S.D.N.Y. 2014). (emphasis added).

Like in *Childers,* Defendants did not file claims on behalf of, or otherwise inform Plaintiffs and the putative Class that they should file refund claims. Defendants had a duty to do so because Defendants knew that they alone possessed the information necessary for Plaintiffs and the putative Class to know to file a refund claim. *See* Compl. (ECF 3) ¶¶ 38. Such information included where Defendants' pre-packaged coffee was sold, in what condition, quantity, form and packaging pursuant to N.Y. Tax Law § 1105(d)(i)(3). *See* Compl. (ECF 3) ¶¶ 33-38.

Further, Defendant Dunkin' Brands have requested tax opinions regarding the taxability of their pre-packaged coffee and, along with Defendant Franchisees know or should know of tax opinions in New York that hold that pre-packaged coffee of the nature sold by Defendants is non-taxable. *See* Exhibit 1 and Exhibit 2, *supra.*

As a result, Defendants are not only aware that their pre-packaged coffee is non-taxable, they also fully understand that Plaintiffs and the putative Class would not have the information necessary to know whether to request a tax refund if they concealed such information.

Defendants owe a duty to Plaintiffs and the putative class to disclose relevant material information necessary for Plaintiffs and the putative Class to know to request a refund of the illegal surcharge assessed by Defendants under the guise of a sales tax on pre-packaged coffee.

This duty arose when Defendant Dunkin' Brands pre-programmed the amount of tax Defendant Franchisees assess on pre-packaged coffee and Defendant Franchisee did not take action to change it, when both Defendants knew that pre-prepackaged coffee was non-taxable, and concealed the information necessary for Plaintiffs and the putative Class to know to request a refund. *See* Compl. (ECF 3) ¶¶ 1-7, 15, 30-31, 33-39.

In order to know to request a refund, Plaintiffs and the putative Class would have to know that pre-packaged coffee is non-taxable. The question of whether pre-packaged coffee is taxable or not turns on whether Defendants sell their pre-packaged coffee unheated and in the same form and condition, quantities and packaging commonly used by food stores for off-premises consumption, pursuant to N.Y. Tax Law § 1105(d)(i)(3)). The facts necessary to make that determination rest solely with Defendants, including where Defendants' products are sold, in what condition, packaging, quantity, *et cetra*.

It would be unreasonable to expect Plaintiffs and the putative Class to know such things about Defendants' operation. Even when Plaintiffs attempted to find out if Defendants' pre-packaged coffee was non-taxable by calling the New York Department of Taxation, they were told it would depend on the factors enumerated in N.Y. Tax Law § 1105(d)(i)(3)). *See* Compl. (ECF 3) ¶¶ 38.

Defendants' reliance on *Cohen* and *Gilbert* for the proposition that this is a tax refund case is misplaced. Neither of those cases involved claims that arose *after* the collection of sales tax, while both involved a Defendant who actually remitted the ill-gotten monies to the State.

In *Cohen,* the court held that "[plaintiffs' claims] that are predicated on the sales tax overcharge allegations must be dismissed because the Court lacks jurisdiction to hear the claims." *Cohen v. Hertz Corp.,* 13 CIV. 1205 LTS AJP, 2013 WL 9450421, at *3 (S.D.N.Y. Nov. 26, 2013).

Similarly, *Gilbert* also held that claims predicated on allegations of improper collection of sales tax must be dismissed because the court lacks subject matter jurisdiction. *Gilbert v. Home Depot, Inc.,* No. 13-cv-853S, 2014 WL 4923107 (W.D.N.Y. Sept. 30, 2014) ("the question of whether a vendor is collecting and remitting sales taxes in accordance with state law is a question that has been entrusted to the Department of Taxation in the first instance.").

However, in this case, Defendants' liability is not predicated on its collection of taxes. Rather, Defendants' liability is predicated on Defendants' omissions that occurred *after* the collection of the illegal surcharge. Thus, this case falls within the holding in *Childers.*

Lastly, the public policy considerations for limiting tax refund suits to actions exclusively against the tax commission are not thwarted by this Court retaining jurisdiction over Plaintiffs claims that arise from omissions that occurred *after* the collection of the illegal surcharge. Defendants are not put between a rock and a hard place, because Plaintiffs and the Class are not seeking to hold Defendants liable for something the tax laws require them to do. *See Childers,* 36 F. Supp. 3d 292, 303-4 (S.D.N.Y. 2014).

**B.       Defendants Have Failed to Fulfill a Condition Precedent to Requesting a Refund Under N.Y. Tax Law § 1139**

Putting aside the issue of whether it is fair to expect consumers to know to request a refund where the relevant material information to make that determination lies solely with Defendants, it is unclear whether Defendants have actually remitted the illegal surcharge to the State because neither Defendant is willing to say they have remitted the illegal surcharge in either of their Memorandum of Law.

Defendants must concede they do not know where the illegal surcharges went, and cannot know. Defendants have not met a *condition precedent* to requesting a tax refund under N.Y. Tax Law § 1139, that either party is entitled to request.

Further, a shareholder, such as Defendant Dunkin' Brand, who has or who could have sufficient authority and control over a Defendant Franchisees' affairs can be held responsible for that Defendant Franchisees' failure to collect and remit sales and use taxes, despite the fact that the shareholder chooses not to take an active role in the corporation. *See In re Hurley*, 1998 N.Y.T.C. T-351 (N.Y.S. Div. of Tax App. 1998).

The plain language of N.Y. Tax Law § 1139 provides that Defendants must first *collect and remit* sales tax before a *taxpayer* (meaning, either Defendants or their customers) can make a request for a tax refund. N.Y. Tax Law § 1139(a)(i) and (ii) provides the following:

> (a)  In the manner provided in this section the tax commission shall refund or credit any tax, penalty or interest erroneously, illegally or unconstitutionally collected or paid if application therefor shall be filed with the tax commission (i) in the case of tax paid by the applicant to a person required to collect tax, within three years **after the date when the tax was payable by such person to the tax commission** as provided in section eleven hundred thirty-seven, or (ii) in the case of a tax, penalty or interest paid by the applicant to the tax commission, within three years after the date when such amount was payable under this article.

N.Y. Tax Law § 1139.

Therefore, because Defendants must concede they do not know where the money went, it is inappropriate to make Plaintiffs and the putative Class seek a remedy they cannot obtain because Defendants have failed to fulfill a condition precedent to the relief it suggests.

Further, if in fact Defendants have failed to remit the illegal surcharge to the State, their affirmative defense would be nothing more than a waste of judicial resources, and would provide Defendants with a windfall profit earned through their failure to disclose to Plaintiffs and the putative Class their right to seek a refund.

**C.      Nothing Prevents Defendants From Returning the Illegal Surcharges to Plaintiffs First, and Applying for a Refund Themselves**

Again, putting aside the issue of whether it is fair to expect consumers to know to request a refund where the relevant material information to make that determination lies solely with Defendants, Defendants' assumption that its customers are the only *taxpayer* who can make a request for a refund under N.Y. Tax Law § 1139 is contrary to the plain language of the statute.

N.Y. Tax Law § 1139(a) provides that a customer *or* a business can request the tax refund, provided the business first refunds the money to the customer.

N.Y. Tax Law § 1139(a) provides the following:

(a)  In the manner provided in this section the tax commission shall refund or credit any tax, penalty or interest erroneously, illegally or unconstitutionally collected or paid if application therefor shall be filed with the tax commission (i) in the case of tax paid by the applicant to a person required to collect tax, within three years after the date when the tax was payable by such person to the tax commission as provided in section eleven hundred thirty-seven, **or** (ii) in the case of a tax, penalty or interest paid by the applicant to the tax commission, within three years after the date when such amount was payable under this article….**No refund or credit shall be made to any person of tax which he collected from a customer until he shall first establish to the satisfaction of the tax commission, under such regulations as it may prescribe, that he has repaid such tax to the customer.**

N.Y. Tax Law § 1139(a) (emphasis added).

13

Therefore, N.Y. Tax Law § 1139(a) provides an efficient and just mechanism for the resolution of Plaintiffs' and the putative Class' claims under the jurisdiction of this Court. *Cingular* and *AT & T Mobility Wireless Data Services Sales Tax Litig.* provides exactly such a template for resolving these claims with little or no downside to Defendants.  In *re AT & T Mobility Wireless Data Services Sales Tax Litig.,* the court approved a settlement of a class of customers unlawfully charged "sales tax" that first required Defendants to return the ill-gotten monies to customers *before defendant* sought a refund from the tax commission pursuant to N.Y. Tax Law § 1139. *AT & T Mobility Wireless Data Services Sales Tax Litig., 789 F. Supp. 2d 935, 939 (N.D. Ill. 2011).*

In *Cingular*, the New York Tax Appeals Tribunal approved of the *re AT & T Mobility Wireless Data Services Sales Tax Litig* court's application of N.Y. Tax Law § 1139(a). *In the Matter of the Petition of New Cingular Wireless PCS LLC*, Determination DTA No. 825318, (N.Y. Div. Tax App. July 2014). In *Cingular,* the New York Tax Tribunal held that where "sales tax" was illegally collected by Cingular from its customers, and were remitted by Cingular to the State, Cingular could repay its customers first under N.Y. Tax Law § 1139, and afterward Cingular could request a refund themselves.) Legal scholars commenting on the approach agreed. S*ee generally,* Joseph Lipari, *Sales Tax Refund Cases Show No Sympathy For Sellers*, The New York Law Journal (September 12, 2014) (in discussing why Cingular lost *In the Matter of the Petition of New Cingular Wireless PCS LLC,* the author laments that Cingular could have avoided losing if it had just repaid the customers first, instead of attempting to use an escrow account as an end-run around the requirements of N.Y. Tax Law § 1139).

If, in fact, the Defendants have actually remitted the illegal surcharges to the State, a magistrate judge, using *Cingular* and *re AT & T Mobility Wireless Data Services Sales Tax Litig,* as a guide, can oversee a refund to Plaintiffs and the putative Class via the mechanism within N.Y. Tax Law § 1139(a). Afterward, Defendants can seek a refund from the State, in order to be made whole. If, in fact the illegal surcharges were not remitted to the State by Defendants, but rather retained, then plainly only this court can resolve the claim.

The impractical alternative that Defendants suggest is for each of its hundreds of thousands customers to apply individually for a refund of the illegal surcharge (assuming they even know they are entitled to a refund, and assuming Defendants have actually collected and remitted).

Further, Defendants' practice *was* to repay customers directly the illegal surcharge its customers were assessed in the guise of a sales tax by its individual franchisees. *See* Compl. (ECF 3) ¶ 53. Now being brought to trial for continuing to illegally assess the surcharges years later, it is specious for Defendants to claims they cannot refund customers directly.

### D. The New York Deceptive Practices Act States it Shall Apply "Whether or Not Subject to Any Other Law of This State

This court has subject matter jurisdiction under § GBL 349. GBL § 349-g states "This section shall apply to all deceptive acts or practices declared to be unlawful, *whether or not subject to any other law of this state*". GBL 349-g (emphasis added).

Numerous New York Court of Appeal decisions have interpreted that provision to apply *without exception*, even in instances where another applicable statute provides an exclusive remedy. *See Riordan v Nationwide Mut. Fire Ins. Co*., 756 F. Supp. 732 (S.D.N.Y. 1990)(held that while Insurance Law § 2601 may be applicable to the facts and provides an exclusive remedy, the court rejected defendant's assertion that GBL § 349 claim should be dismissed

because subsection (g) states "this section shall apply to *all* deceptive acts or practices declared to be unlawful, *whether or not subject to any other law of this state"*); *see also Hart v. Moore*, 155 Misc.2d 203 (N.Y. Misc. 1992)(held that while Insurance Law § 2601 may be applicable to the facts, exclusive remedy provision of § 2601 did not preclude GBL § 349 claim pursuant to subsection (g)); *see also Walts v First Union Mtge. Corp.*, 259 A.D. 2d 322 (N.Y. App. Div. 1999)(held that while GBL § 349 claims were predicated on Insurance Law § 6503 which did not provide private right of action, court held GBL § 349 claim was maintainable regardless, pursuant to subsection (g)); *see also Farino v Jiffy Lube Intl.*, 298 AD2d 553 (2002) (held that while GBL § 349 claims were predicated on violation of another statute which did not provide private cause of action, GBL § 349 claim could be maintained pursuant to subsection (g)); *see Llanos v. Shell Oil Co.*, 866 N.Y.S.2d 309, 309 (N.Y. App. Div. 2d Dept. 2008) (held that while GBL § 396-i may be applicable to the facts and provides an exclusive remedy, the court rejected defendant's assertion that GBL § 349 claim should be dismissed because subsection (g) states "this section shall apply to *all* deceptive acts or practices declared to be unlawful, *whether or not subject to any other law of this state*.)

For the aforementioned reasons, Plaintiffs have made a colorable pleading of subject matter jurisdiction, and Defendant's Motion to Dismiss on these grounds should be denied.

## II.   THE APPLICABLE LEGAL STANDARD

### A.   Subject Matter Jurisdiction

"[I]t is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). "[A]ll that a plaintiff must show at this stage is a "colorable pleading of subject

matter jurisdiction." *Aurecchione v. Schoolman Transp. Sys. Inc.,* 426 F.3d 635, 638 (2d Cir.2005). "The Court must construe all ambiguities and draw all inferences in the plaintiff's favor*." Childers v. New York and Presbyterian Hosp.,* 36 F. Supp. 3d 292, 301 (S.D.N.Y. 2014). "Moreover, at this stage of litigation (*i.e.,* the pleading stage), it is not necessary for the district court to determine which party shall ultimately prevail." *Aurecchione v. Schoolman Transp. System, Inc.*, 426 F.3d 635, 638-39 (2d Cir. 2005). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer,* 416 U.S. at 236.

Further, in resolving a motion to dismiss for lack of subject matter jurisdiction, a district court may refer to evidence *outside* the pleadings. *See Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986). "Under Rule 12(b), a 'speaking' motion, i.e., a motion that includes evidentiary matters outside the pleadings, is properly converted to a Rule 56 motion *only* when it is made under Rule 12(b)(6): failure to state a claim. However, when, as here, subject matter jurisdiction is challenged under Rule 12(b)(1), evidentiary matter may be presented by affidavit or otherwise". *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1010-11 (2d Cir. 1986). *See Exchange National Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1130-31 (2d Cir.1976). "While a 12(b)(1) motion cannot be converted into a Rule 56 motion, Rule 56 is relevant to the jurisdictional challenge in that the body of decisions under Rule 56 offers guidelines in considering evidence submitted outside the pleadings." *Kamen, supra, citing Exchange National Bank of Chicago* at 1131; *Gordon v. National Youth Work Alliance,* 675 F.2d 356, 360-61 (D.C.Cir.1982).

"Moreover, in resolving claims that they lack jurisdiction, courts have acted in a fashion suggestive of 56(f): they have required that the party asserting jurisdiction be permitted discovery of facts demonstrating jurisdiction, at least where the facts are peculiarly within the knowledge of the opposing party. " *Kamen, supra. See, e.g., Investment Properties International, Ltd. v. IOS, Ltd.,* 459 F.2d 705, 707-08 (2d Cir.1972); *Williamson v. Tucker,* 645 F.2d 404, 414 (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); *Timberlane Lumber Co. v. Bank of America,* 574 F.Supp. 1453, 1461 (N.D.Cal.1983), *aff'd,* 749 F.2d 1378 (9th Cir.1984), *cert. denied,* 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985). "Similarly, courts have required that evidence submitted outside the pleadings be 'competent.'" *Kamen*, *supra*; *See Peay v. Morton,* 571 F.Supp. 108, 110 (M.D.Tenn.1983); *Miller v. Indiana Hospital,* 562 F.Supp. 1259, 1267 n. 11 (W.D.Pa.1983).

### B.      Failure to State A Claim

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all well-pleaded factual allegations and must draw all reasonable inferences in favor of the nonmoving party. *See Famous Horse Inc. v. 5th Ave. Photo Inc.,* 624 F.3d 106, 108 (2d Cir.2010). To withstand dismissal, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007) (emphasis added) (the Court in *Twombly* reasoned that the plaintiff must allege facts "plausibly" suggesting the existence of a conspiracy. This "plausibility" standard, while not a "probability" standard, requires "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."))

"[W]here a cause of action is based in fraud, "the circumstances constituting the wrong shall be stated in detail'" pursuant to N.Y. C.P.L.R. 3016 (b). *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178 (2011); *see also* Fed. R. Civ. Proc. 9(b) (requirement to allege fraud with particularity).

## III.    THE PLAINTIFFS HAVE STATED PLAUSIBLE CLAIMS

### A.    Plaintiffs Have Stated Plausible GBL § 349 Claims

Plaintiffs have sufficiently stated allegations and incorporated documents by reference in Plaintiffs' Complaint, that if presumed true and all inferences drawn in favor of Plaintiffs and the putative Class, establish plausible prima facie GBL § 349 claims against Defendants.

To assert a claim under GBL § 349, a plaintiff must plead the existence of three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act. Notably, an allegation of fraud is not required. *Genesco Entertainment, a Div. of Lymutt Industries, Inc. v. Koch*, 593 F. Supp. 743, 751 (S.D. N.Y. 1984).

Relevant to this matter, a GBL § 349 claim lies where "a business alone possesses material information that is relevant to the consumer and fails to provide this information….[T]he Bank's liability under the statute will depend, in part, on whether plaintiffs possessed or could reasonably have obtained the relevant information they now claim the Bank failed to provide." *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A*., 647 N.E.2d 741, 745 (N.Y. 1995).

Like *Oswego*, Plaintiffs' Complaint has stated a plausible GBL § 349 claim arising from Defendant's failure to notify Plaintiffs and the putative Class of their right to seek a tax refund each and every time they purchased pre-packaged coffee at the individual franchisee stores and

were assessed an illegal surcharge in the guise of a sales tax, when Defendants were in sole possession of relevant material information that if known to Plaintiffs and the Class, would have put them on notice that they could request a tax refund.

First, Defendants were aware that its pre-packaged coffee is non-taxable pursuant to N.Y. Tax Law § 1105(d)(i)(3). *See* Compl. (ECF 3) ¶ ¶ 4-5, 37, 39, 50-52. Defendants also knew that Plaintiffs and the putative Class would not know to request a refund because the information necessary to make such a determination lies solely with Defendants. *See* Compl. (ECF 3) ¶ ¶ 37-8.

Second, Defendants had the motivation and ability to set the tax on pre-packaged coffee in each and every one of Defendant Franchisees registers. It can be reasonably inferred that Defendants would be motivated by the chance to reap more profit vis-a-vis their licensing agreement if Defendant Franchisees assessed an illegal surcharge on pre-packaged coffee. *See* Compl. (ECF 3) ¶ 30. Further, Defendant Dunkin' Brands has the ability to pre-program tax on pre-packaged coffee in Defendant Franchisees registers and Defendant Franchisee does not have to change it. *See* Compl. (ECF 3) ¶ 15, 31.

Third, Defendants fail to tell Plaintiffs and the putative Class that they should seek a refund, and instead conceals this from them.  *See* Compl. (ECF 3) ¶ ¶ 6-7.

Contrary to Defendant Dunkin' Brands' allegation, it does not matter that the franchisee agreement incorporated by reference in Plaintiffs' Complaint permits the individual franchisees to set their own prices because nothing in the agreement prohibits Defendant Dunkin' Brands from pre-programming the registers with "default settings" that Defendant Franchisees can later change to reflect their own state tax laws.

Under these set of facts, one can imagine a situation where an individual franchisee opens the box to a new cash register, loads the software pre-programmed to charge tax on pre-packaged coffee set by Defendant Dunkin' Brands, and doesn't change it, or worse, is required to go up the corporate chain to get it changed.

Applied among multiple franchisees--some insistent on following the law by changing the pre-programmed software, and others not--this would result in an inconsistency in the amount of tax charged among individual franchisees, while also giving a plausible reading to the allegations in Plaintiffs' Complaint that Defendant Dunkin' Brands is directly liable for the injuries of the Plaintiffs and the putative Class, and Defendant Franchisees' are complicit in the scheme.

<u>Fourth</u>, it is unreasonable to expect Plaintiffs and the putative Class to know whether Defendants' pre-packaged coffee fit into one of the tax exemptions in the N.Y. Tax Laws because that analysis turns on where the pre-packaged coffee was sold, in what form, condition, quantity and packaging pursuant to N.Y. Tax Law § 1105(d)(i)(3), something only Defendants would know.

Therefore, Defendants had a duty to notify Plaintiffs and the putative Class of the fact that they were entitled to a tax refund. Failing to notify Plaintiffs and the putative Class when the relevant material information to make such an analysis was solely in Defendants' possession is deceptive conduct. *See Oswego Laborers' Loc. 214 Pension Fund, supra.* Defendants have received a windfall from their deceptive conduct because they are not required to remit the illegal surcharge when their customers cannot know to request a refund because Defendants have failed to notify them of their right to make a request.

Thus, Defendant Dunkin' Brands' allegation that Plaintiffs and the putative Class have suffered no "actual injury" is misplaced. This is not a case about the quantity or ingredients of the pre-packaged coffee, as Defendants suggests.

Rather, it is a case about Defendants' failure to notify Plaintiffs and the putative Class that they were entitled to a tax refund when the relevant material information necessary to know to request a tax refund rested solely with Defendants.

Defendants now compound their deceptive actions by representing to Plaintiffs and the putative Class that N.Y. Tax Law § 1139(a) provides the exclusive remedy in this case, when in fact, the statute provides that Defendants could repay first, and then request a refund from the State themselves.

### B. Plaintiffs Have Stated Plausible Fraud Claims

Plaintiffs have sufficiently stated allegations and incorporated documents by reference in Plaintiffs' Complaint, that if presumed true and all inferences drawn in favor of Plaintiffs and the putative Class, establish plausible prima facie fraud claims against Defendants.

Under New York law, the elements of a claim for fraud are: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.,* 443 F.3d 230, 234 (2d Cir.2006); *accord Albert Apartment Corp. v. Corbo Co.,* 182 A.D.2d 500, 582 N.Y.S.2d 409, 410 (1st Dep't 1992).

Where a claim for fraud is based on a material omission, the complaint also must allege a duty to disclose. *See Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 292 (2d Cir.2006); *accord Kaufman v. Cohen,* 307 A.D.2d 113, 760 N.Y.S.2d 157, 165 (1st Dep't 2003); *see also Mandarin Trading Ltd. v. Wildenstein,* 16 N.Y.3d 173, 179 (2011). A duty to disclose arises

"where the parties enjoy a fiduciary relationship" or "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Lerner,* 459 F.3d at 292.

Further, under Rule 9(b), "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). But because "we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations[,] ... plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995) (internal quotation marks and citation omitted). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994).

As to reasonable reliance, "if the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him [or her] of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the representation, he [or she] must make use of those means, or he [or she] will not be heard to complain that he was induced to enter into the transaction by misrepresentations" (*Curran, Cooney, Penney v. Young & Koomans,* 183 A.D.2d 742, 743, quoting *Schumaker v. Mather,* 133 N.Y. 590, 596  (Ct. of App. 1892); *see UST Private Equity Invs. Fund v. Salomon Smith Barney,* 288 A.D.2d 87, 88 (App. Div 2001).

Plaintiffs' Complaint has stated a plausible claim of fraud arising from Defendant's failure to notify Plaintiffs and the putative Class of their right to seek a tax refund each and

every time they purchased pre-packaged coffee at the individual franchisee stores and were assessed an illegal surcharge in the guise of a sales tax where Defendants' possessed superior knowledge regarding the taxability of its pre-packaged coffee.

First, Defendants have superior knowledge that its pre-packaged coffee is non-taxable. Defendants know Plaintiffs and the putative Class cannot readily obtain such knowledge. Compl. (ECF 3) ¶ 38.  Further, Defendants know that Plaintiffs and the putative Class act on this lack of knowledge when purchasing pre-packaged coffee that includes an illegal surcharge in the guise of a sales tax. Compl. (ECF 3) ¶¶ 40-49.

Defendants therefore have a duty to disclose the superior knowledge to the Plaintiffs and the putative Class, but instead concealed such superior knowledge to Plaintiffs' and the putative Class' detriment. Compl. (ECF 3) ¶ ¶ 6-7.

Second, contrary to Defendant Dunkin' Brands allegation, Plaintiffs Complaint has stated plausible allegations and incorporated documents by reference that give rise to a "strong inference of fraudulent intent" against Defendants.

Plainitffs' Complaint makes sufficient allegations of *opportunity* and *motive* upon which strong inferences can be drawn that both Defendants intended to conceal its superior knowledge in order to reap a substantial windfall.

Defendant Dunkin' Brands has the opportunity to commit the fraud because it pre-programs the taxes into each individual franchisee register, and Defendant Franchisees can simply fail to change the default programming. Compl. (ECF 3) ¶ ¶ 15,31; *see* Exhibit 3, *Franchise Disclosure Document, Dunkin' Donuts Franchising LLC, p. 76-78,* incorporated by reference in Compl. (ECF 3) ¶ 31 (Defendant's franchisee agreement mandates its franchisees use *Radiant Brand* cash registers. *Id.* Defendant further mandates that the individual franchisees

must purchase special software for the cash registers, and that Defendant has pre-programmed the software. *Id* ("All stores are required to have and you must purchase all Retail Information Technology System designated by us for the size and configuration of your Store" and "we have required our approved suppliers to make special modifications to their equipment and systems to comply with our requirements." ). Defendant further requires that its franchisees give them access to their Radiant Brand cash registers via a remote link that is connected by a "high-speed network solution" of Defendant's choosing. *Id.* Additionally, Defendant requires that their individual franchisees accept "Store Value Cards". Pre-programming cash registers and maintaining the control to do so remotely at the corporate level is not uncommon in this industry.).

Additionally, Defendants both have the motive to commit fraud because they benefit from increased profits. Defendant Dunkin' Brands would receive more royalty payments when its individual franchisees either pocket the illegal surcharges, or remit the illegal surcharges to the tax commission and pay less on their taxes. Compl. (ECF 3) ¶ ¶ 6,52.

Third, Plaintiffs Complaint has stated plausible allegations and incorporated documents by reference that Plaintiffs and the putative Class' reliance on Defendants' omissions were reasonable.

The information needed to determine whether Defendants' pre-packaged coffee is taxable, pursuant to N.Y. Tax Law § 1105(d)(i)(3)), is not readily within Plaintiffs and the putative Class' possession, nor do the Plaintiffs and the putative Class have any means to obtain such information by ordinary use of intelligence. For example, as alleged in the Complaint, even when Plaintiffs called the Department of Taxation to inquire whether pre-packaged coffee was taxable or not, the agency informed Plaintiffs that it would depend on where the item was sold,

in what form, condition, quantity, and packaging--all matters that only Defendants have knowledge regarding. Compl. (ECF 3) ¶ ¶ 38.

Fourth, Plaintiffs Complaint has stated plausible allegations and incorporated documents by reference that Plaintiffs and the putative Class suffered damages as a result of Defendants' omissions. Plaintiffs and the putative Class are without the knowledge to request a sales tax refund, which would otherwise enable them to seek a tax refund on the illegal surcharge assessed in the guise of a sales tax. Compl. (ECF 3) ¶ ¶ 7.

Contrary to Defendants' allegation that the economic loss doctrine bars a cause of action for fraud, Plaintiffs and the putative Class' have sustained damage as a result of Defendants' fraud that is distinct and in addition to their purchase of pre-packaged coffee.

"[A] party who has breached a contract may be charged with separate tort liability for fraud arising from a breach of duty that is distinct from, or in addition to, the breach of contract." 60A *N.Y. Jur.* § 7 (citing *Freedman v. Pearlman,* 271 A.D.2d 301, 304 (1st Dep't 2000); *Licette Music Corp. v. A.A. Records, Inc.,* 196 A.D.2d 467 (1st Dep't 1993); *Bernstein v. Polo Fashions, Inc.,* 55 A.D.2d 530, 531(1st Dep't 1976)).

"In particular, it is well established that a misrepresentation of present fact which is the inducement for a contract is collateral to said contract, and can support a separate fraud claim." *EED Holdings v. Palmer Johnson Acq. Corp.,* 387 F. Supp. 2d 265, 279 (S.D.N.Y. 2004); *First Bank of Americas v. Motor Car Funding,* 257 A.D.2d 287, 292 (1st Dep't 1999) ("[A] misrepresentation of present facts is collateral to the contract (though it may have induced the plaintiff to sign the contract) and therefore involves a separate breach of duty.").

In the context of fraud, Plaintiffs and the putative Class' damages arose as a result of Defendants failure to disclose that Plaintiffs and the putative Class were entitled to a tax refund.

These omissions are collateral to the actual purchase of pre-packaged coffee. While there is no specification of these damages in the complaint, no such specification is required. *See EED Holdings v. Palmer Johnson Acq. Corp.*, 387 F. Supp. 2d 265, 279 (S.D.N.Y. 2004); *see also G–I Holdings Inc. v. Baron & Budd,* 179 F.Supp.2d 233, 269 (S.D.N.Y.2001).

Further, Defendants now compound their fraudulent actions by representing to Plaintiffs and the putative Class that N.Y. Tax Law 1139(a) provides the exclusive remedy in this case, when in fact, the statute provides that Defendants could repay first, and then request a refund from the State themselves.

### C.    Plaintiffs Have Stated Plausible Negligence Claims

Plaintiffs have sufficiently stated allegations and incorporated documents by reference in Plaintiffs' Complaint, that if presumed true and all inferences drawn in favor of Plaintiffs and the putative Class, establish plausible prima facie negligence claims against Defendants.

"Under New York law...a plaintiff must establish three elements to prevail on a negligence claim: '(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.' " *Alfaro v. Wal–Mart Stores, Inc*., 210 F.3d 111, 114 (2d Cir.2000) (quoting *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (1981)).

Plaintiffs' Complaint has stated a plausible claim of negligence arising from Defendant Dunkin' Brands failure to notify Plaintiffs and the putative Class of their right to seek a tax refund each and every time they purchased pre-packaged coffee at the Defendant Franchisees' stores and were assessed an illegal surcharge in the guise of a sales tax.

First, Plaintiffs Complaint has stated plausible allegations and incorporated documents by reference that Defendants had a duty to inform or disclose to Plaintiffs and the putative Class that they were entitled to a sales tax refund.

This duty arose when Defendant Dunkin' Brands pre-programmed the taxes into each of Defendant Franchisees' registers, and Defendant Franchisee failed to re-program them, knowing full well that pre-packaged coffee was non-taxable. Compl. (ECF 3) ¶ ¶ 15,31; *see* Exhibit 1, *Franchise Disclosure Document, Dunkin' Donuts Franchising LLC, p. 76-78, supra.*

Second, Plaintiffs Complaint has stated plausible allegations and incorporated documents by reference that Defendants breached their duty by failing inform or disclose that Plaintiffs and the putative Class were entitled to tax refunds after they made purchases at Defendant Franchisees' stores that used Defendant Dunkin' Brands pre-programmed registers. *See* Compl. (ECF 3) ¶ ¶ 1, 6-7.

Third, Plaintiffs Complaint has stated plausible allegations and incorporated documents by reference that because of Defendants' breach, Plaintiffs and the putative Class have suffered injury . *See* Compl. (ECF 3) ¶ ¶ 1-2, 6-7.

Defendants allegation that the economic loss doctrine bars the cause of action for negligence is misplaced. Plaintiffs and the putative Class' have sustained injury as a result of Defendants' negligence that is distinct and in addition to their purchase of pre-packaged coffee.

While some jurisdiction have done away with the economic loss doctrine altogether, New York courts have held that the doctrine, as applied in negligence causes of action, is a grey area in New York state law. In describing the issue, the New York Court of Appeals said:

> Between actions plainly *ex contractu* and those as clearly *ex delicto* there exists what has been termed a border-land, where the lines of distinction are shadowy and obscure, and the tort and the contract so approach each other, and become so nearly coincident as to make their practical separation somewhat difficult.

*Sommer v. Federal Signal Corp.* 79 N.Y.2d 540, 548-9 (1992), *quoting Rich v. New York Cent. & Hudson Riv. R.R. Co.,* 87 N.Y. 382, 390; *see also, Matter of Paver & Wildfoerster Catholic High School Assn.*, 38 N.Y.2d 669, 678; Prosser, Selected Topics on the Law of Torts, ch. VII, *The Borderland of Tort and Contract* (1953); Note, *The Elastic Concept of Tort and Contract As Applied By the Courts of New York,* 14 Brooklyn L.Rev. 196 (1948) ;*accord Hydro Inv'rs, Inc. v. Trafalgar Power Inc*., 227 F.3d 8, 17 (2d Cir. 2000).

In *North Shore Bottling Co.*, the court recognized that "a contracting party may be charged with a separate tort liability arising from a breach of a duty distinct from, or in addition to, the breach of contract." *North Shore Bottling Co. v. Schmidt & Sons,* 22 N.Y.2d 171, 179 (N.Y. 1968); *accord Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1369 (N.Y. 1992). Courts have held that "where plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory" and the economic loss doctrine will apply. *Sommer v. Fed. Signal Corp.,* 593 N.E.2d 1365, 1369 (N.Y. 1992).

*But*, where "the duty to act with reasonable care is not only a function of its private contract...but also stems from the nature of [defendant's] services", the economic loss doctrine *does not* apply as a matter of protecting the public from the harms that would befall the public were defendants in dereliction of their duties under state law and regulation. *Id* at 1370.

In determining what is meant by the "nature of [defendant's] services" the court in *Sommer* said the economic loss doctrine did not apply in a negligence action where a fire alarm company failed in its duty to notify the fire department in time to prevent the economic damage to a skyscraper for which the plaintiffs sought redress.

The court reasoned that because the fire alarm companies are regulated by laws *to protect the public interest*, dereliction in the performance of those duties would cause *public harm. Id.* The court in *Sommer* concluded, "[plaintiffs are] not seeking the benefit of its

29

contractual bargain, but instead seeks recovery of damages for a fire that spread out of control….” *Id.*

*Sommer* is similar to the case at present because Defendants' duty to collect tax is highly regulated by the state. Through its regulations, the state *entrusts* Defendants with knowing what to tax, and properly collecting and remitting the tax to the state.  The dereliction of those duties entrusted to Defendants by the state would cause enormous harm to the public, as exemplified in this case.

This is especially so because the legislative purpose of enacting tax exemptions for pre-packaged coffee, as well as other food items the legislature has deemed “basic necessities”, is so not to unduly burden poorer families who pay a larger proportion of their income in food than do affluent families.

Therefore, Defendants' breach of their duty to inform or disclose to Plaintiffs and the putative Class is not just harmful to all involved, it is *especially* harmful to those for whom the exemptions were specifically enacted to protect: poorer families and individuals. That is because poorer families and individuals may not have access to resources to determine the taxability of items, and so they must trust that Defendants are following the laws, and would never know otherwise unless Defendants informed them.

### D.    Plaintiffs Have Stated Plausible Breach of Contract Claims

Plaintiffs have sufficiently stated allegations and incorporated documents by reference in Plaintiffs' Complaint, that if presumed true and all inferences drawn in favor of Plaintiffs and the putative Class, establish plausible prima facie breach of contract claims against Defendants.

"Under New York law, the implied covenant of good faith and fair dealing inheres in every contract." *Travellers Int'l, A.G. v. Trans World Airlines, Inc.,* 41 F.3d 1570, 1575 (2d Cir.1994); *accord Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384, 389 (1995).

First, Plaintiffs Complaint has stated plausible allegations and incorporated documents by reference that Defendant Dunkin' Brands had a duty of good faith and fair dealing that extended beyond the initial contract made at each of Defendant Franchisees' stores when it pre-programmed taxes into Defendant Franchisees' registers it knew it could not assess on pre-packaged coffee. *See* Compl. (ECF 3) ¶ ¶ 1-7.

Second, Plaintiffs Complaint has stated plausible allegations and incorporated documents by reference that Defendants breached that duty by failing to later inform or disclose to Plaintiffs and the putative Class that they were entitled to a refund, when Defendants knew the information to make such a determined rested solely in Defendants' possession. *See* Compl. (ECF 3) ¶ ¶ 6-7, 37-8.

Third, Plaintiffs Complaint has stated plausible allegations and incorporated documents by reference that Defendant Dunkin' Brands breached caused Plaintiffs and the putative Class to be injured. *See* Compl. (ECF 3) ¶ ¶ 6-7.

Defendant Dunkin' Brands' allegation that there can be no duty of good faith and fair dealing unless there first exists an underlying contract between parties in privity with each other is misplaced. By pre-programming the tax for the sale of pre-packaged coffee into the registers, which it knew Defendant Franchisees' would use to transact sales, Defendant Dunkin' Brands is in privity of contract with Plaintiffs and the putative Class. *See* Compl. (ECF 3) ¶ ¶ 15, 31-2.

### E.      Plaintiffs Have Stated Plausible Unjust Enrichment Claims

Plaintiffs have sufficiently stated allegations and incorporated documents by reference in Plaintiffs' Complaint, that if presumed true and all inferences drawn in favor of Plaintiffs and the putative Class, establish plausible prima facie unjust enrichment claims against Defendants.

"The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd. P'ship v. Phoenix Pictures, Inc.,* 373 F.3d 296, 306 (2d Cir.2004); *accord Clark v. Daby,* 300 A.D.2d 732, 751 (3d Dep't 2002). Stated differently, a claim for unjust enrichment in New York will lie only where the defendant possesses money or received a benefit that in equity and good conscience the defendant should not retain because it belongs to the plaintiff. *See N. Shipping Funds I. L.L.C. v. Icon Capital Corp.*, No. 12 Civ. 2584 (JCF), 2014 WL 700198, at *22 (S.D.N.Y. Feb. 24, 2014).

Courts have held that it would be against equity and good conscience to allow " employers [to] profit from erroneously withholding FICA tax from the wages of its employees then subsequently recovering refunds of the amounts withheld without informing, or repaying, the employees." *See United States v. Allen,* No. 1:91CV0244, 1992 WL 437652, at *4–5, *5 n. 2 (N.D.Ohio 1992) (listing cases and holding that the employer "recovered a windfall of sorts by receiving a refund of amounts withheld from the wages of the [employees] and by retaining, and not repaying, those amounts to the [employees]").

First, Plaintiffs Complaint has stated plausible allegations and incorporated documents by reference from which an inference can be drawn that Defendants were enriched because they would receive more in profit, in the case of Defendant Franchisees and royalties, in the case of Defendant Dunkin' Brand from Defendant Franchisees' use of the registers pre-programmed by

Defendant Dunkin' Brands that assessed illegal surcharges under the guise of a sales tax on pre-packaged coffee, provided the illegal surcharges were not remitted the State.  *See* Compl. (ECF 3) ¶ ¶ 1-2, 6-7, 15, 31-2.

This enrichment was at Plaintiffs' and the putative Class' expense in that had Defendant Dunkin' Brands disclosed or informed them of the right to request a tax refund, Plaintiffs and the putative Class would have had the opportunity to request the refund.

Second, Plaintiffs Complaint has stated plausible allegations and incorporated documents by reference from which an inference can be drawn that equity and good conscience militate against Defendant Dunkin' Brands profiting from its failure to inform or disclose to Plaintiffs and the putative Class that they should request a tax refund when the relevant material information to do so rests solely with Defendants.

This case is analogous to *United States v. Allen* in that Defendants would receive a windfall profit from concealing from Plaintiffs and the putative Class information solely in Defendants' possession that they were entitled to a refund of the illegal surcharges. Therefore, the circumstances are such "that equity and good conscience require defendant to make restitution." *Violette v. Armonk Associates, L.P.*, 872 F. Supp. 1279, 1282 (S.D.N.Y. 1995).

Even Defendant Dunkin' Brands admits that "Defendant Franchisees could arguably have unjustly benefitted from an 'illegal sales tax'" under the same theory that Plaintiffs and the putative Class put forward here to say Defendant Dunkin' Brands is also unjustly enriched. *See* Defendant Dunkin' Brands Memorandum of Law, p. 18.

Lastly, it is unavailing for Defendant Dunkin' Brand to claim that its franchisee agreement states that Defendant Franchisees must pay in royalties only gross sales less applicable sales tax, if in fact, Defendant Franchisee never treated the illegal surcharges as sales

tax, by retaining the illegal surcharges for themselves. This is only further evinced by the fact that Defendant Franchisee has failed to state where the illegal surcharges went when they had ample opportunity in their Memorandum of Law.

## **CONCLUSION**

For the foregoing reasons, Defendant Dunkin' Brands' motion to dismiss should be denied.

Dated:          New York, New York
                May 24, 2016

                                    Respectfully submitted,

                                    **MAYER LAW GROUP, LLC**


                                    s/ Zachary J. Liszka_____
                                    Zachary J. Liszka, Esq.
                                    Carl J. Mayer, Esq.
                                    1180 Avenue of the Americas, Suite 800
                                    New York, New York 10036
                                    (212)382-4686
                                    (212)382-4687
                                    zachliszka@gmail.com
                                    cyberesquire@aol.com

                                    *Attorneys for Plaintiffs and the putative Class*

EXHIBIT 1

DEPARTMENT OF THE TREASURY
DIVISION OF TAXATION
PO BOX 269
TRENTON, NJ 08695-0269



July 3, 2013



## LETTER RULING

Dear ▮▮▮▮▮▮:

This is in response to your May 1, 2013 Letter Ruling request to the New Jersey Division of Taxation regarding the application of the New Jersey Sales and Use Tax Act (N.J.S.A. 54:32B-1 et seq.) to sales of food items in New Jersey by Dunkin Donuts ("Taxpayer").

### Facts

Taxpayer is incorporated in Delaware and its corporate headquarters is located in Canton, Massachusetts. Taxpayer enters into franchise agreements with unrelated third parties to acquire and operate Taxpayer franchises. Effectively, the franchise agreements allow for franchisees to sell food items, including, but not limited to: bakery items, sandwiches, bananas, beverages, and ground coffee. Taxpayer has 775 franchise locations within the State of New Jersey. These locations are owned and operated by approximately 140 different franchisees. Under the terms of the franchise agreement, each franchisee is responsible for collecting and remitting sales tax. All of the franchisees strive to properly collect sales tax.

### Issues

1. Whether the 75% threshold test for determining whether eating utensils have been "provided by the seller" is determined at the franchisee level or at Taxpayer's level.

2. What is the taxability of the following items if the seller is over the 75% threshold and utensils are "provided by the seller"?

http://www.state.nj.us/treasury/taxation/
New Jersey Is An Equal Opportunity Employer • Printed on Recycled and Recyclable Paper

212 382 4687

a. Individual bakery items including, but not limited to: a bagel, donut, munchkin, muffin, cookie, danish, or pastry.

b. A half dozen or a dozen donuts packaged as one item and sold for a single price.

c. Eight donuts, where a half dozen donuts are packaged and sold for a single price and two donuts are sold as individual items (priced per donut).

d. Bananas.

e. Bottled water, juice (containing greater than 50% vegetable or fruit juice by volume), or milk.

f. Box of Joe (10 serving cups of coffee) sold as a single unit with cups, stirrers, sugar and cream.

g. Packaged coffee (whole beans, ground, or K-Cups).

h. Combo items, such as two donuts and one coffee, sold as a single unit for a single price.

i. Box of Joe (10 serving cups of coffee) sold as a single unit with cups, stirrers, sugar, and cream sold alongside a dozen donuts.

3. What is the taxability of the following items, if the seller is under the 75% threshold and utensils are not "provided by the seller"?

a. Individual bakery items, including, but not limited to: a bagel, donut, munchkin, muffin, cookie, danish, or pastry.

b. A half dozen or a dozen donuts packaged as one item and sold for a single price.

c. Eight donuts, where one-half dozen donuts are packaged and sold for a single price and two donuts are sold as individual items (priced per donut).

d. Bananas.

e. Bottled water, juice (containing greater than 50% vegetable or fruit juice by volume), or milk.

f. Box of Joe (10 serving cups of coffee) sold as a single unit with cups, stirrers, sugar, and cream.

g. Packaged coffee (whole beans, ground, or K-Cups).

h. Combo items, such as two donuts and one coffee, sold as a single unit for a single price.

i. Box of Joe (10 serving cups of coffee) sold as a single unit with cups, stirrers, sugar, and cream sold alongside a dozen donuts.

### Discussion

The New Jersey Sales and Use Tax Act imposes tax on the retail sale of tangible personal property, services, and specified digital property unless a valid exemption exists. N.J.S.A. 54:32B-3(a).

N.J.S.A. 54:32B-8.2 defines "food and food ingredients" as "substances, whether in liquid, concentrated, solid, frozen, dried, or dehydrated form, that are sold for ingestion or chewing by humans and are consumed for their taste or nutritional value." This term does not include tobacco, alcoholic beverages, candy, or soft drinks. While the sale of food and food ingredients purchased for human consumption is exempt from sales tax under N.J.S.A. 54:32B-8.2 of the Sales and Use Tax Act, the sale of "prepared food" is not. N.J.S.A. 54:32B-3(c)(1). N.J.S.A. 54:32B-3(c)(1)(i) defines "prepared food" as:

1. Food sold in a heated state by the seller; or
2. Food items that are a result of the seller combining two or more food ingredients to make a single item; or
3. Food sold with eating utensils (plates, cutlery items, glasses, cups, napkins or straws. Plates do not include containers for transport).

"Prepared food" also includes the following, but *only* when sold with utensils:

1. Food sold by a seller whose primary NAICS classification is manufacturing in section 311, except subsector 3118 (bakeries);
2. Food sold in an unheated state by weight or volume as a single item; or
3. Bakery items sold as such, including but not limited to, bread, rolls, buns, biscuits, bagels, croissants, pastries, donuts, danish, cakes, tortes, pie, tarts, muffins, bars, cookies, and, tortillas.

N.J.A.C. 18:24-12.2A sets forth the rules to be used to determine whether food is sold with eating utensils "provided by the seller." Under that regulation, if a business' gross

annual sales of 1) food sold in a heated state or heated by the seller and, 2) food which is the result of the seller mixing or combining two or more food ingredients to make a single item, are more than 75% of its total sales of food and food ingredients (excluding alcohol) then utensils merely have to be made available by the seller for the sale to be considered one of "prepared food", which is taxable in New Jersey. All sales are treated as being sold with utensils "provided by the seller," and are taxable as "prepared food" if the business exceeds the 75% threshold and has a kiosk or other area where napkins, forks, straws, etc. are available to customers.

The only exception to the above rule is for the sale of items that contain four (4) or more servings packaged as one item sold for a single price. These "bulk items" do not become prepared food due to the seller having utensils available (e.g., whole cakes, loaves of bread). Whenever available, serving sizes will be determined based on the label on the item sold. If no label is available, a seller will reasonably determine the number of servings in the item. N.J.A.C. 18:24-12.2A(b).

Under N.J.A.C. 18:24-12.2A, the 75% threshold is calculated as follows:

First, determine the numerator, which is comprised of the total dollar value of sales of prepared food that is either sold in a heated state or heated by the seller; plus sales of prepared food made up of two or more food ingredients mixed or combined by the seller for sale as a single item; plus sales of food that cannot be transferred to the purchaser without plates, bowls, glasses, cups, or other utensils (e.g., fountain beverages, salad bar); then divide the numerator determined above by the total dollar value of all sales of food and food ingredients, including prepared food, candy, dietary supplements, and soft drinks, but not including alcoholic beverages.

For sellers with a sales percentage of 75% or less, utensils are considered to be "provided by the seller" if the seller's practice (as represented by the seller) is to physically give or hand the utensil to the purchaser for use in consumption of the item, except that plates, bowls, glasses, or cups necessary for the purchaser to receive the food (e.g., dispensed milk, salad bar) need only be made available.

For sellers with a sales percentage greater than 75%, utensils are considered to be "provided by the seller" if utensils are merely made available to purchasers. Thus, utensils at a kiosk or common area are treated as utensils "provided by the seller."

The 75% threshold is calculated by the seller for each tax year or business fiscal year, based on the seller's data from the prior tax year or business fiscal year, as soon as possible after accounting records are available, but not later than 90 days after the beginning of the tax or business fiscal year. A new business will make a percentage

based on a good faith estimate for the first year. A new business should adjust its good faith estimate prospectively after the first three months of operation if its actual sales materially affect the 75% threshold.

The Sales and Use Tax Act imposes sales tax on "soft drinks." Soft drinks are defined as nonalcoholic beverages that contain natural or artificial sweeteners. N.J.S.A. 54:32B-8.2. The term does not include beverages that contain milk or milk products (including soy, rice, or similar milk products) or greater than 50 percent vegetable or fruit juice by volume.

Bundling/Combo Meals
Food bundles which include both taxable and non-taxable items, are exempt from sales tax if the value of the non-taxable items is greater than the value of the taxable items. If the value of the taxable items is greater than the value of the exempt items, the sale is subject to sales tax.

Sellers can determine the value of the taxable and non-taxable items in the bundle by using either their cost of the individual items or the sales price of the individual items sold. To use the sales price option the seller must actually sell the individual items separately in addition to selling them as part of a bundle. If the seller does not make individual sales of the items in the bundle, they must use the cost of each item.

Conclusions
1. The 75% threshold for determining whether eating utensils have been "provided by the seller" is determined at the franchisee level.

2. The taxability of the items if the seller is over the 75% threshold and utensils are "provided by the seller" is as follows:

a. Individual bakery items, including, but not limited to, a bagel, donut, munchkin, muffin, cookie, danish, or pastry.
Since the seller is over the 75% threshold, utensils merely have to be made available in order for the sale of a bagel, donut, munchkin, muffin, cookie, danish, or pastry to be taxable.

b. A half dozen or a dozen donuts packaged as one item and sold for a single price.
Since the package contains four or more servings packaged as one item sold for a single price, tax is not due if the seller does not hand the customer a utensil which is intended for use in consumption of the item.

c. Eight donuts, where a half dozen donuts are packaged as one item and sold for a single price and two donuts are sold as individual items (priced per donut).

The sale of six donuts packaged as one item sold for a single price is not taxable if the seller does not hand the customer a utensil which is intended for use in consumption of the item. However, a charge for two donuts is taxable if utensils are merely available.

d. Bananas.

Since the seller is over the 75% threshold, utensils merely have to be made available in order for the sale of a banana to be taxable.

e. Bottled water, juice (containing greater than 50% vegetable or fruit juice by volume), or milk.

Since the seller is over the 75% threshold, utensils merely have to be made available in order for the sale of bottled water, juice, and milk to be taxable.

f. Box of Joe (10 serving cups of coffee) sold as a single unit with cups, stirrers, sugar, and cream.

Food sold in a heated state is subject to tax. Thus, charges for a Box of Joe are taxable. It is irrelevant whether or not the seller is over or under the 75% threshold or how many servings it has.

g. Packaged coffee (whole beans, ground, or K-Cups).

So long as the package contains four or more servings packaged as one item sold for a single price, tax is not due if the seller does not hand the customer a utensil which is intended for use in consumption of the item.

h. Combo items, such as two donuts and one coffee, sold as a single unit for a single price.

A combo meal consisting of two donuts and one hot coffee sold for one non-itemized price is subject to tax because there is a presumption that it is sold with utensils.

i. Box of Joe (10 serving cups of coffee) sold as a single unit with cups, stirrers, sugar, and cream sold alongside a dozen donuts.

Food sold in a heated state is subject to tax. Thus, charges for a Box of Joe are taxable. It is irrelevant whether or not the seller is over or under the 75% threshold. A separate charge for a dozen donuts packaged as one item sold for a single price is not taxable if the seller does not hand the customer a utensil which is intended for use in consumption of the item.

3. The taxability of the items, if the seller is under 75% threshold and utensils are not "provided by the seller" is as follows:

a. Individual bakery items, including, but not limited to, a bagel, donut, munchkin, muffin, cookie, danish, or pastry.

The exclusion from "prepared food" for bakery items applies and tax is not due unless the seller actually hands the customer a utensil which is intended for use in consumption of the item.

b. A half dozen or a dozen donuts packaged and sold for a single price.

The exclusion from "prepared food" for bakery items applies and tax is not due unless the seller actually hands the customer a utensil which is intended for use in consumption of the item.

c. Eight donuts, where a half dozen donuts are packaged and sold for a single price and two donuts are sold as individual items (priced per donut).

The exclusion from "prepared food" for bakery items applies and tax is not due unless the seller actually hands the customer a utensil which is intended for use in consumption of the item.

d. Bananas.

Tax is not due unless the seller actually hands the customer a utensil which is intended for use in consumption of the item.

e. Bottled water, juice (containing greater than 50% vegetable or fruit juice by volume), or milk.

Since neither bottled water, juice (containing greater than 50% vegetable or fruit juice by volume), and milk meet the definition of a "soft drink", tax is not due unless the seller actually hands the customer a utensil which is intended for use in consumption of the item.

f. Box of Joe (10 serving cups of coffee) sold as a single unit with cups, stirrers, sugar, and cream.

Food sold in a heated state is subject to tax. Thus, charges for a Box of Joe are taxable. It is irrelevant whether or not the seller is over or under the 75% threshold.

g. Packaged coffee (whole beans, ground, or K-Cups).

Tax is not due unless the seller actually hands the customer a utensil which is intended for use in consumption of the item. It is irrelevant whether or not the seller is over or under the 75% threshold or how many servings it has.

h. Combo items, such as two donuts and one coffee, sold as a single unit for a single price.

A combo meal consisting of two donuts and one hot coffee sold for one non-itemized price is subject to tax because there is a presumption that it is sold with utensils.

i. Box of Joe (10 serving cups of coffee) sold as a single unit with cups, stirrers, sugar, and cream sold alongside a dozen donuts.

Food sold in a heated state is subject to tax. Thus, charges for a Box of Joe are taxable. It is irrelevant whether or not the seller is over or under the 75% threshold. The exclusion from "prepared food" for bakery items applies to the separate charge for the dozen donuts and tax is not due unless the seller actually hands the customer a utensil which is intended for use in consumption of the item.

Please contact me at the telephone number above if I can be of further assistance.

Very truly yours,

Beth A. Berniker
Tax Services Specialist
Regulatory Services Branch

A Letter Ruling is limited to the facts set forth therein and is binding on the Division of Taxation only with respect to the person or entity to whom it is issued and only if the person or entity fully and accurately describes all relevant facts. A Letter Ruling is based on the law, regulations, and Division policies in effect as of the date the Letter Ruling is issued or for the specific time period at issue in the Letter Ruling.

EXHIBIT 2

STATE OF NEW YORK

DIVISION OF TAX APPEALS

_____

|  |  |  |
|---|---|---|
| In the Matter of the Petition | : | |
| of | : | |
| **FOREST VIEW ADULT DAY CARE** | : | DETERMINATION |
| | | DTA NO. 820297 |
| for Revision of a Determination or for Refund of Sales and Use Taxes under Articles 28 and 29 of the Tax Law for the Period September 1, 1998 through November 30, 1999. | : | |
| | : | |

_____:

Petitioner, Forest View Adult Day Care, 457 Doughty Boulevard, Inwood, New York 11096, filed a petition for revision of a determination or for refund of sales and use taxes under Articles 28 and 29 of the Tax Law for the period September 1, 1998 through November 30, 1999.

A hearing was held before Winifred M. Maloney, Administrative Law Judge, at the offices of the Division of Tax Appeals, 641 Lexington Avenue, New York, New York, on September 8, 2005 at 11:00 A.M., with all briefs to be submitted by February 10, 2006, which date began the six-month period for the issuance of this determination.  Petitioner appeared by Isaac Sternheim, CPA.  The Division of Taxation appeared by Christopher C. O'Brien, Esq. (Lori P. Antolick, Esq., of counsel).

### ISSUE

Whether the Division of Taxation properly denied petitioner's refund application.

### FINDINGS OF FACT

1.  Petitioner, Forest View Adult Day Care ("Forest View"), a division of Forest View Nursing Home, Inc., is an outpatient facility for adults located at 457 Doughty Boulevard in

19.  Petitioner did not receive invoices with any deliveries from Brooklyn Enterprises or any of its designees.  Rather, petitioner received the detail sheet outlined above as an attachment to each month's invoice.

## *CONCLUSIONS OF LAW*

A.  Tax Law § 1105(d)(i) imposes a tax on:

> The receipts from every sale of . . . food and drink of any nature or of food alone, when sold . . . by . . . other establishments in this state, or by caterers . . .
>
> (1)  in all instances where the sale is for consumption on the premises where sold;
>
> (2)  in those instances where the vendor or any person whose services are arranged for by the vendor, after delivery of the food or drink by or on behalf of the vendor for consumption off the premises of the vendor, serves or assists in serving, cooks, heats or provides other services with respect to the food or drink; and
>
> (3)  in those instances where the sale . . . is for consumption off the premises of the vendor, except where food (other than sandwiches) or drink or both are (A) sold in an unheated state and, (B) are of a type commonly sold for consumption off the premises and in the same form and condition, quantities and packaging, in establishments which are food stores other than those principally engaged in selling foods prepared and ready to be eaten.

Tax Law § 1132(c)(1) provides, in pertinent part, as follows:

> For the purpose of the proper administration of this article and to prevent evasion of the tax hereby imposed, it shall be presumed that all receipts for property or services of any type mentioned in subdivisions (a), (b), (c) and (d) of section eleven hundred five . . . are subject to tax until the contrary is established, and the burden of proving that any receipt . . . is not taxable hereunder shall be upon the person required to collect tax or the customer.

B.  The sales tax regulations, 20 NYCRR 527.8(f), concerning caterers, in pertinent part, provide the following:

> (1)  Sales by caterers.
>
> (i) All charges by caterers selling food or drink who provide serving or assistance in serving, cooking, heating or other services after delivery are taxable.

(ii) Sales of food or drink by caterers where the caterers merely deliver the items purchased and offer no other services after delivery are deemed to be sales for off-premises consumption and are taxable in accordance with the provisions of subdivision (a) of this section.

(iii) Sales of food or drink by caterers where the caterers deliver the items purchased and arrange the food on platters or place the drink in containers so that food or drink is ready to serve to guests are taxable.

The regulations at 20 NYCRR 527.8(a) provide, in pertinent part, that:

Sales tax is imposed on the receipts . . . from every sale of . . . food or drink of any nature sold . . . by caterers:

(1)  in all instances where the sale is for consumption on the premises where sold;

(2) in those instances where the sale is for consumption off the premises and the vendor (or someone acting on behalf of the vendor) after delivery either serves or assists in serving, cooks, heats or provides services with respect to the food or drink; and

(3) in those instances where the sale is for consumption off the premises of the vendor all sandwiches and other food or drink unless the food or drink is sold in:

(i) an unheated state; and

(ii) the same form and condition, quantities and packaging commonly used by food stores not principally engaged in selling foods prepared and ready to be eaten.

20 NYCRR 527.8(e) provides as follows:

*Consumption off premises.*  The phrase *for consumption off the premises* shall mean that the food, including sandwiches, or drink is intended to be consumed at a place away from the vendor's premises.

(1)  Food or drink in a heated or unheated state.  The determination of when food or drink is sold either in a heated or unheated state must be made according to the vendor's method of merchandising.

(i) If the vendor attempts to maintain the food at a temperature which is warmer than the surrounding air temperature by using heating lamps, warming trays, ovens or similar units, or cooks to order, the vendor is selling food in a heated state.

-13-

(ii) If the vendor sells prepared foods from units maintained at or below surrounding air temperature, such sales are sales of prepared food in an unheated state.

*Example 1:* A supermarket sells barbecued chicken hot from a rotisserie to be taken home and eaten.  This is a taxable sale of heated food.

*Example 2:* A food store sells potato salad by the pound and also sells hot pastrami by the pound for home consumption.  The potato salad is not taxable but the pastrami is subject to tax.

(2) Form, condition, quantity and packaging sold in food stores.

(i) The term *food stores* shall mean any establishment which is principally engaged in selling food or drink which is not prepared and ready to be eaten. Supermarkets, grocery stores, fish markets, produce markets, bakeries and meat markets are examples of the types of establishments considered to be food stores. When a department within food stores makes sales of food or drink which are subject to tax, it must collect the tax.

(ii) Food sold in an unheated state is taxable when sold as sandwiches or meals ready to be eaten when arranged on plates or platters as individual or multiple servings regardless of how the sales price is arrived at (pound v. serving).

(iii) Food sold in an unheated state is not subject to tax when commonly sold in food stores in bulk by weight by the dozen (or part thereof) or by volume (gallon, quart, etc.) for off-premises consumption.

(iv) Sales of heated and unheated food in combination on plates or as dinners are subject to tax on the total charge.

*Example 3:* Cold cuts, salads and bakery products are sold by a restaurant for home consumption.  The restaurant charges its customer by the pound for the cold cuts and salad and by the dozen or loaf for the bakery products.  Such sales are not taxable.

*Example 4:* A supermarket sells and arranges cold cuts on platters for customers.  The customer is charged by the pound for the cold cuts.  Sales of this type are taxable.

*Example 5:* Sandwiches sold through vending machines or other establishments are taxable in all instances.

*Example 6:* A take-out establishment sells 10 pieces of chicken, six rolls and one pound of potato salad as a meal for three persons and charges one price for the package. A sale of this type is taxable in full.

C.  During the period September 1, 1998 through November 30, 1999, petitioner, an adult day care center, paid sales tax on bulk food purchased from Brooklyn Enterprises. Subsequently, petitioner filed a refund request alleging that the bulk food supplier erroneously charged sales tax to the adult day care center. Based upon its determination that petitioner's bulk food purchases are of heated and cooled foods and no cooking is done on petitioner's premises, the Division concluded that the purchases are subject to sales tax as catering services and denied petitioner's refund request in full. Petitioner contends that its food purchases are exempt from the imposition of sales tax by Tax Law § 1105(d)(i)(3).

Statutory exemptions are strictly construed against the taxpayer, who must demonstrate that the only reasonable interpretation of the provision provides his or her entitlement to the exemption (*Matter of Grace v. New York State Tax Commn*., 37 NY2d 193, 371 NYS2d 715, *lv denied* 37 NY2d 708, 375 NYS2d 1027; *Matter of Blue Spruce Farms v. New York State Tax Commn*., 99 AD2d 867, 472 NYS2d 744, *affd* 64 NY2d 682, 485 NYS2d 526). It is petitioner's position that its bulk food purchases totaling $1,457,085.00 during the period September 1, 1998 through November 30, 1999, which it claims fall into two categories, "cold foods" and "prepared foods," are nontaxable because of the manner in which Brooklyn Enterprises sold and delivered the food to petitioner.

D.  Petitioner contends that Brooklyn Enterprises improperly charged sales tax on its sales of cold foods to the adult day care center totaling $832,620.00 ($249,786.00 in sales of bulk baked goods plus $208,155.00 in sales of canned vegetables, fruits and desserts, etc. plus $374,679.00 in sales of fresh fruits and vegetables, milk, coffee, etc.), during the period

-15-

September 1, 1998 through November 30, 1999.  It claims that Brooklyn Enterprises sold and

delivered cold foods, such as, baked goods, canned fruits, vegetables and desserts, fresh fruits

and vegetables, dairy products and coffee, to the adult day care center unheated and in the same

form and condition, quantities and packaging commonly used by food stores for off-premises

consumption and therefore these sales of cold foods are not subject to sales tax.

The evidence clearly establishes that the cold foods which Brooklyn Enterprises, as

vendor, sold and delivered in bulk to petitioner during the period at issue are exempt from sales

tax pursuant to Tax Law § 1105(d)(i)(3).  The poorly drafted contract required the vendor to

provide (sell and deliver) to petitioner food products, including, but not limited to, canned fruits,

canned vegetables, fresh fruits, fresh vegetables, milk, cottage cheese and coffee.  It also

required the vendor to supply (sell and deliver) to petitioner on a daily basis all needed fresh

sugar free baked goods including, among other items, assorted breads, assorted rolls, assorted

muffins and cakes.  The vice president and administrator in charge of all operations at Forest

View, Mr. Davidowitz, credibly testified about the quantity, form and manner in which food

products are sold by Brooklyn Enterprises to petitioner.  Based upon the number of clients it

expects to serve during the coming week, petitioner orders canned fruits, vegetables and desserts,

fresh fruits and vegetables, dairy products and fresh baked goods from Brooklyn Enterprises.

Either Brooklyn Enterprises or one of its suppliers delivers these food products in bulk quantities

to petitioner.  Large no. 10 size cans of fruits, vegetables and desserts are delivered to petitioner,

whereupon these canned goods are stored in the pantry until they are used by petitioner's kitchen

staff as part of a meal served to its clients.  Ten-pound bags of coffee are delivered to petitioner

and are used by petitioner's kitchen staff to prepare coffee in the kitchen's large commercial

coffee maker.  A produce market delivers fresh fruits and vegetables in their natural raw state in

large crates and petitioner's kitchen staff prepares and cuts up these fruits and vegetables before serving them to its clients.  Large size dairy products including, among other items, one-gallon bottles of milk and three-pound containers of cottage cheese, are delivered by Brooklyn Enterprises to petitioner, whose kitchen staff pours or portions out and serves them to the clients.  On a daily basis, a bakery delivers fresh baked goods including, among other items, two-pound loaves of assorted types of breads, assorted types of rolls, assorted varieties of muffins and cakes to petitioner.  Depending upon the meal being served, petitioner's kitchen staff may, among other things, cut up the baked goods, such as the rolls, muffins and cakes, or use the loaves of bread or rolls to make sandwiches, and serve them to clients.  Clearly, Brooklyn Enterprises sold and delivered unheated (cold) foods, commonly sold in food stores in bulk by weight, by the dozen or by volume for off-premises consumption, to petitioner during the period September 1, 1998 through November 30, 1999 (*see*, 20 NYCRR 527.8[a][3]; [e][1], [2][i], [iii]).  Therefore, Brooklyn Enterprises's sales of bulk quantities of cold foods, i.e., baked goods, canned fruits, vegetables and desserts, fresh fruits and vegetables, milk and coffee, etc., are exempt from taxation pursuant to Tax Law § 1105(d)(i)(3).

E.  Petitioner contends that Brooklyn Enterprises improperly charged sales tax on its sales of prepared foods (the foods used as part of the lunches served to both shifts) in bulk to the adult day care center totaling $624,465.00 during the period September 1, 1998 through November 30, 1999.  Petitioner admits that Brooklyn Enterprises hired a caterer who prepared and shipped foods to Forest View in large insulated containers.  However, petitioner asserts that the prepared foods are never delivered to Forest View at a ready-to-eat temperature and must be heated to 165 degrees in order to be served, because the insulated containers in which the prepared foods are delivered merely slow the cooling process and prevent bacterial contamination.  Since Forest

View must bring the prepared foods up to the proper serving temperature, petitioner argues that these foods are not "ready to eat" and therefore are not taxable.  Petitioner's argument is without merit.  Tax Law § 1105(d)(i)(3) imposes a tax on the receipts from "every sale of food and drink of any nature or of food alone, when sold . . . by caterers" where the sale is for consumption off the premises of the vendor unless the food or beverage is sold unheated and in the same form, condition, quantities and packaging commonly used by food stores not principally engaged in selling food prepared and ready to be eaten.  If the caterer only delivers the food or beverage, the sale is taxable only if it is taxable as an off-premises sale (20 NYCRR 527.8[f][1][ii]).  The sales tax is imposed on all sales of sandwiches or heated food or beverage for off-premises consumption (20 NYCRR 527.8[a][3]).  Other prepared foods or beverages sold for off-premises consumption are taxable unless they are sold in an unheated state, and in the same form and condition, quantities and packaging commonly used in establishments that are food stores other than those principally engaged in selling foods prepared and ready to be eaten (20 NYCRR 527.8[a][3][i], [ii]).  Whether a food or beverage is sold in a heated state depends upon the vendor's sales methods (20 NYCRR 527.8[e][1]).  If the vendor attempts to maintain the food at a temperature warmer than the surrounding air temperature by artificial means, or cooks to order, the vendor is selling food in a heated state (20 NYCRR 527.8[e][1][i]).  The contract required Brooklyn Enterprises to hire a caterer, with proper kosher and nutritional authorizations, to provide fully cooked, sugar and salt free, foods per a daily menu to Forest View.   After planning an entire month's lunch menus for both shifts, petitioner sends these menus to Brooklyn Enterprises and the caterer responsible for preparing the foods.  On a weekly basis, petitioner sends written confirmation of the specific daily lunch menus and the quantity needed for each shift to both Brooklyn Enterprises and the caterer.  Each day, the caterer prepares and then fully

cooks all foods specified on that day's menu in large pans and, after covering the pans with aluminum foil, immediately puts them into large insulated containers, which the caterer then seals.  Immediately upon delivery, the sealed insulated containers are opened, the pans of prepared foods are removed and Forest View's dietician checks the internal temperature of each pan of prepared food with a food thermometer.  In accordance with New York City Department of Health guidelines, the prepared foods are accepted if the internal temperature is 140 degrees or higher and rejected if the internal temperature is lower than 140 degrees.  Depending upon the time of delivery, the kitchen staff will either put the prepared foods into the oven to bring them up to proper serving temperature (165 degrees) or put them into the refrigerator in compliance with Department of Health guidelines.  Clearly, since the caterer hired by Brooklyn Enterprises prepared and cooked the food to order and delivered the prepared foods at a temperature warmer than the surrounding air temperature, Brooklyn Enterprises sold the prepared foods in a heated state to Forest View (*see,* 20 NYCRR 527.8[d],[e][1][i]).  Therefore, the prepared foods are properly subject to tax (*see*, Tax Law § 1105[d][i][3]; *see also*, 20 NYCRR 527.8[a][3]).

F.  The record includes the monthly invoices and attached detail sheets, prepared and sent by Brooklyn Enterprises to petitioner, on which the contested sales tax was imposed.  Brooklyn Enterprises collected sales tax on its sales of bulk food, paper goods and drinks and any special service.  Each detail sheet contained a clear breakdown of the bulk food sales made by Brooklyn Enterprises during the period covered on the invoice referenced on that sheet.  Based upon the breakdown set forth on the detail sheets, petitioner divided the bulk food sales into two categories, "cold foods" and "prepared foods."  Petitioner's cold foods category include the sales of bulk bread, rolls, cookies and baked goods (bulk baked goods), sales of canned vegetables, fruits and desserts, etc. and sales of fresh fruits and vegetables, milk, coffee, etc.  While

petitioner's prepared food category only consisted of the sales of bulk food, to wit, the hot and cold food prepared by the caterer and served by petitioner as lunch for both shifts, petitioner is seeking a refund of the sales tax it paid on all of the bulk food (cold foods and prepared foods) purchased from Brooklyn Enterprises.  In Conclusion of Law "D", I determined that the sales of bulk baked goods (i.e., bulk bread, rolls, cookies and baked goods), canned vegetables, fruits and desserts, fresh vegetables and fruits, milk, coffee, etc., categorized as cold foods by petitioner, qualify for exemption from taxation.  Therefore, taking that determination into consideration, the Division is directed to recompute the sales tax due in this matter and issue a refund accordingly.

G.  The petition of Forest View Adult Day Care is granted in accordance with Conclusions of Law "D" and "F", and in all other respects the Division of Taxation's denial of petitioner's claim for refund is sustained.

DATED:  Troy, New York
                 August 10, 2006

/s/   Winifred M. Maloney
ADMINISTRATIVE LAW JUDGE

EXHIBIT 3

advisory capacity only and will not have either operational or decision making power.

RETAIL INFORMATION TECHNOLOGY SYSTEMS - APPROVED PLATFORMS

All stores are required to have and you must purchase all Retail Information Technology System designated by us for the size and configuration of your Store.  We require that all Retail Information Technology Systems be maintained in "continuous operational condition."  The components of our required Retail Information Technology System and cost ranges are described below.  You will use the Retail Information Technology Systems to, among other things, pay royalties and late fees, process credit and gift cards, submit Profit and Loss statements, access the companies franchisee intranet, access your back-office systems, access your Mystery Shop scores, run your video surveillance systems, use the library of Dunkin' Brands Online University learning programs and courses, and connect to the Internet.  We have required our approved suppliers to make special modifications to their equipment and systems to comply with our requirements.  All stores are required to comply with the construction and wiring standards relating to Retail Information System, including point-of-sale equipment, in the store, including dedicated isolated grounded power, for use solely with the point-of-sale system and its approved components.  If you are buying an existing store with an older cash register system or that does not otherwise comply with our required Retail Information Technology System, we will require you to purchase and install an approved point-of-sale system as well as all other approved Retail Information Technology Systems in the store as a condition of our approval of the transfer.  In order for you to maintain your Retail Information Technology Systems in conformity with our requirements, you may be required, from time to time, to upgrade the Retail Information Technology Systems.  This will, from time to time, require maintenance to be performed on the equipment.  The approved vendors provide choices in maintenance services on either a contractual or "time and materials" basis.

Your cost per store will depend, among other things, on your Store's size and configuration, and the system options you may choose.  It may be more expensive to install approved equipment in an existing Store than in a new Store.  Hardware and software costs will vary according to the minimum configuration we determine for your Store (e.g., the number of point of sale terminals, counter and drive-through, printers and prep stations devices), plus any additional options you may choose.

**Point-of-Sale Systems:**

We require you to process and record all of your sales on a point-of-sale/back office system ("POS System") that is approved by us.  All approved POS systems are capable of recording accumulated sales and cannot be turned back or reset and they retain data in the event of power loss.  As of the date this Disclosure Document was prepared, Radiant Systems is the only approved point-of-sale equipment vendor and Red Prairie is the only approved integrated back office vendor.  We do not anticipate approving additional vendors for POS Systems.

Approved minimum POS configurations and prices are reflected below.

POS System Cost Range DD only:

| Concept | # of POS | # of VDU | # of Prep | Initial Cost | Annual Maintenance Year 1 | Annual Maintenance Year 2+ |
|---|---|---|---|---|---|---|
| Dunkin' with Drive Thru | 4 | 2 | 1 | $20,308 | $3,206 | $4,140 |
| Dunkin' without Drive Thru | 2 | 1 | 1 | $13,102 | $2,918 | $3,513 |
| APOD Single Terminal P1220 | 1 | 1 | 1 | $ 9,236 | $2,785 | $3,199 |

POS System Cost Ranges for DD/BR Combo Stores:

| Concept | # of POS | # of VDU | # of Prep | Initial Cost | Annual Maintenance Year 1 | Annual Maintenance Year 2+ |
|---|---|---|---|---|---|---|
| DD-BR w/ Drive-Thru | 5 | 2 | 2 | $24,110 | $3,340 | $4,486 |
| DD-BR w/o Drive-Thru | 3 | 1 | 1 | $16,862 | $3,049 | $3,825 |

* You may need additional POS Systems depending on the size and configuration of your store.

"VDU" means video display unit.

"Initial Cost" includes hardware, software, training, installation and deployment.

"Annual Maintenance" includes hardware, software and SEI helpdesk.

The above prices do not include:

1. Taxes and Freight
2. Manager's Workstation (Lenovo PC bundles range from $1,050 - $1,950)
3. Managed High Speed network, equipment and installation from approved provider (NTIC ranges from $165 to $623 per month for a service line)

Manager's Workstation

We require you to have a Manager's Workstation (a computer, monitor, and printer) that meets our minimum standards and is capable of accessing the Internet. This Workstation may also be used for any other software that you use to manage your business.

For all New England franchises, manager workstations are required to be purchased from the Northeast DCP. For all other franchises, you have an option of purchasing a workstation that meets our minimum requirements from the National DCP, our approved vendor, Lenovo, or a third party vendor of your choice. Prices for these workstations range from $1,050 to $1,950.

Network

All stores are required to have a fully managed, private, high-speed network solution approved by us, as well as a dedicated dial-up phone line for use with POS and other technology initiatives (e.g. - credit and gift card processing, video surveillance systems and Dunkin' Brands Online University learning programs and courses). NTIC is the approved fully managed, private, high-speed network provider for all Dunkin' Donuts franchises. The cost range for high speed internet is $165 to $623 per month. To order high-speed internet for a new store, a 'Plain Old Telephone Service' (POTS) line is required. A POTS line can be ordered through you local exchange carrier and state. Once the POTS line is in place, high-speed internet can be ordered through the DCP (newstores@ddnedc.com or 1-888-365-4DCP).

Coin Changer

To increase thru-put at checkout, reduce cashier errors and improve staff productivity, franchisees are encouraged to install coin changers in their Stores. Telequip is the vendor approved to be used with the Radiant POS System. Coin changers can be purchased by contacting Radiant at 1-800-229-0991 ext. 7057.

Video Surveillance

To enable both store and remote view of activities, inclusive of a POS overlay, we may require you to purchase and install a video surveillance camera system that is integrated into your POS System. We may require you to purchase this system from a single, approved vendor. Price ranges are $4,500 - $12,000 depending on the number of cameras installed.

<u>SEI Help Desk Services</u>
SEI Information Services is the approved Radiant Certified Help Desk provider, offering a first point of contact for assistance with retail technologies.  SEI troubleshoots malfunctioning systems, arranges for hardware repairs, and answers questions about technology operations.  A current Help Desk contract with SEI is required for each of your POS Systems.

<u>Polling</u>
We require that you provide us and your Retail Technology vendors continuous independent access to data from your Retail Information Technology Systems, through our approved fully managed, high-speed network solution, as well as a dedicated back-up dial-up phone line.

<u>Profit and Loss Statements</u>
We require that you submit to us via electronic format, monthly Profit and Loss Statements.  These electronic statements must be submitted though the FTS application via http://franchiseecentral.dunkinbrands.com.

<u>Chase Merchant Services</u>
You are required to participate in the credit card program which includes Mastercard, Visa, American Express and Discover.  Radiant POS systems have credit card functionality integrated into the system.  You should expect to pay monthly bank fees.

<u>Stored Value Card ("SVC")</u>
You are required to participate in the stored value card program.  The amount on the card can be added onto with either cash or a Credit Card, and the amount of each purchase made with the card is automatically deducted.  The Dunkin' approved Radiant POS has the SVC functionality integrated into the system, so no additional hardware is required.  You should expect to pay monthly bank fees.

<u>Miscellaneous</u>
Computer systems are vulnerable in varying degrees to computer viruses, bugs, power disruptions, communication line disruptions, Internet access failures, Internet content failures, and attacks by hackers and other unauthorized intruders.  It is your responsibility to protect yourself from these problems, which include taking steps to secure your systems (including continually updating firewalls, password protection, and anti-virus systems), and to use backup systems.

**C.  Site Selection:**

We try to focus real estate development activities in markets where real estate and demographic analysis indicate new stores can be supported.  For new stores, we may select the site, or we may approve a site that you select and bring to us.  Factors affecting our decision generally include location, occupancy costs, proximity to major retail activity, traffic volume and speed, density of nearby population (resident or daytime), competition and potential for encroachment on other units of the same brand, site configuration, parking, accessibility, visibility, signage permitted by the landlord and local governmental authorities and other factors.  Each site is considered individually, as no two sites are the same.  Factors other than those listed above may be considered in evaluating a particular site.  We do not guarantee that any site will be successful.

If you submit a site for our consideration, you must provide us with all required information about the site.  You must not sign a lease for a site before we approve it, unless it is conditioned upon our site approval.  You may not begin any construction on a site until we have approved it.  We do not typically pay "finders' fees" for sites.

In order to develop a new store(s), you may be required to sign an SDA.  Under SDAs, you are responsible for locating and securing sites within boundaries specified by us.  All sites must be approved by us, and must be developed by you in accordance with our requirements.  You cannot develop a site until we approve it.  We will not reimburse you for any costs you incur with respect to any location not approved by us.  While we try to promptly review nominated sites, there is no specified time period in which we must respond to your approval